John HEMPHILL, Plaintiff–Appellant,

v.

State of NEW YORK, C.O. Surber, C.O. William E. Kelly, C.O. Daniel J. Gunderman, C.O. Carola Straley, C.O. Miller, C.O. Thomas W. Boss, and C. Sgt S.J. Williams, Defendants–Appellees.

No. 02–0164.

United States Court of Appeals, Second Circuit.

Argued: May 27, 2004.

Decided: Aug. 18, 2004.

to mount collateral attacks on unfavorable administrative judgments or on denials of the right to grieve.

Joel Landau, Prisoners' Legal Services of New York, Albany, N.Y. (Karen Murtagh–Monks, Tom Terrizzi, on the brief), for Plaintiff–Appellant.

Sachin Pandya, Assistant Solicitor General, for Eliot Spitzer, Attorney General, State of New York, New York, N.Y. (Martin Hotvet, David Lawrence III, on the brief), for Defendants–Appellees.

Before: CALABRESI and SACK, Circuit Judges, and PAULEY, District Judge.[1]

CALABRESI, Circuit Judge.

John Hemphill, an inmate at Green Haven Correctional Facility ("Green Haven") in Stormville, New York, filed suit, under 42 U.S.C. § 1983, in the United States District Court for the Southern District of New York, alleging, *inter alia,* that the defendants used excessive force against him and denied him medical attention in violation of the Eighth Amendment's prohibition on cruel and unusual punishment. After the Supreme Court held in *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), that the Prison Litigation Reform Act's exhaustion requirement, 42 U.S.C. § 1997e(a), applies to excessive force claims, the defendants moved for summary judgment as to Hemphill's excessive force claim. In a judgment dated April 26, 2002, the district court (McMahon, *J.*) found that Hemphill had not ex-

___

1. The Honorable William H. Pauley III, United States District Judge for the Southern District of New York, sitting by designation.

hausted that claim as required by the Prison Litigation Reform Act ("PLRA"), because he had failed to file a formal grievance complaining of defendants' conduct. The court, having earlier and on the same ground dismissed Hemphill's medical indifference claim, therefore dismissed Hemphill's complaint in its entirety.

Hemphill appealed, and his suit was argued alongside several other cases concerning the nature and scope of the PLRA's exhaustion requirement (the "consolidated cases").[2] After the parties submitted briefs in this appeal, our court held in *Ziemba v. Wezner*, 366 F.3d 161 (2d Cir.2004) (per curiam), that certain actions by defendants "may ... estop[ ] the State from asserting the exhaustion defense," *id.* at 163. At oral argument, counsel for the defendants requested leave to file a supplemental letter brief addressing the applicability of *Ziemba* to this case and to the cases heard together with Hemphill's. We granted his motion, and allowed the other parties to this action and to the other consolidated cases to reply. Today, based upon our holdings in *Ziemba* and in the other consolidated cases, we vacate the district court's grant of summary judgment to the defendants, and remand the case for further proceedings.

## I. Background

### A. New York Department of Correctional Services ("DOCS") Grievance Procedures

The regular DOCS grievance procedure consists of three tiers. First, the inmate files a level 1 grievance (either on an Inmate Grievance Complaint Form, or on plain paper if the form is not readily available) with the Inmate Grievance Resolution Committee ("IGRC"), which is composed of fellow inmates and prison officials.[3] The IGRC must convene a hearing, if necessary, within seven working days, and issue a written decision within two days of the hearing. Next, the inmate has four days to appeal the IGRC decision to the superintendent of the facility, who must respond within ten days and must provide "simple directions" on how to appeal to the next level, the Central Office Review Committee ("CORC"). The inmate's final opportunity for resolution of his grievance is to appeal to the CORC within four working days of the superintendent's decision. The CORC then has 20 working days to render a decision. 7 N.Y.C.R.R. § 701.7(c)(4).[4]

DOCS also provides an "expedited" process for complaints of inmate harassment or other misconduct by prison employees. The requirements of this expedited procedure are contested by the parties to this case. At the time the incidents alleged by the plaintiff occurred, relevant DOCS regulations stated:

A. An inmate who feels that he has been the victim of employee misconduct or harassment should first report such occurrences to the immediate supervisor of that employee. This does not preclude submission of a formal grievance.

2. Those cases included; *Ortiz v. McBride*, 380 F.3d 649, 2004 WL 1842644; *Giano v. Goord*, 380 F.3d 670, 2004 WL 1842652; *Johnson v. Testman*, 380 F.3d 691, 2004 WL 1842669; and *Abney v. McGinnis*, 380 F.3d 663, 2004 WL 1842647.

3. The inmate has fourteen days from the date of the incident complained of to file a complaint, but "mitigating circumstances" may toll the deadline. 7 N.Y.C.R.R. § 701.7(a)(1).

4. The regulations advise inmates "to attempt to resolve a problem on [their] own" before resorting to formal procedures. 7 N.Y.C.R.R. § 701.3(a). We have stated that an inmate who obtains a favorable resolution of his complaint through informal processes has exhausted available administrative remedies under the DOCS scheme. *See Marvin v. Goord*, 255 F.3d 40, 43 n. 3 (2d Cir.2001) (per curiam).

B. All allegations of employee misconduct shall be given a grievance calendar number and recorded in sequence with all other grievances .... All documents submitted with the allegation must be forwarded to the superintendent by the close of business that day.

C. The superintendent or his/her designee shall promptly determine whether the grievance, if true, would represent a bona fide case of harassment as defined in section II above. If not, then it shall be returned to the IGRC for normal processing.

DOCS Directive 4040 (June 8, 1998), at 11; see also 7 N.Y.C.R.R. § 703 (1998).

The Directive goes on to require, in cases where "the grievance is a bona fide harassment issue," that the superintendent initiate an investigation and render a decision within twelve days. DOCS Directive 4040 (June 8, 1998), at 11. If the Superintendent fails to respond within twelve days, the inmate may appeal to the CORC for relief. Id.

### B. Facts and Procedural History

Hemphill made the following allegations in his complaint. On November 28, 1997, as he was returning to his cell from a medical appointment, Hemphill was stopped by Corrections Officer ("CO") Miller, who said he wished to speak with him. COs Miller, Boss, and Straley then escorted Hemphill to a room, where CO Surber was waiting. CO Surber ordered Hemphill to enter, at which time CO Gunderman grabbed Hemphill, slammed him into a chair, slapped him, and placed his knee in Hemphill's groin while Surber pressed his elbow into Hemphill's neck and said, "You know what you did, admit it, you better drop it." The chair tipped over, and Hemphill fell to the floor. As Surber and Gunderman put their weight on Hemphill, Surber allegedly repeated, "You know what you did, admit it." The two COs

then lifted him from the floor, slammed him into a wall, and punched him in his stomach, back, and side. CO Kelly came into the room and pushed Hemphill's head down.

During the alleged assault, Hemphill says he asked, "what are you talking about? Drop what? The only thing that I did was file a notice of intention to file a claim upon the attorney general." Hemphill inquired of Surber, "Is that what you and your punk ass friends beat me up for?" After repeating "You know what you did, you better drop it," Surber informed Hemphill that he would be placed in keeplock, and instructed Gunderman, Kelly, Boss, and Miller to escort Hemphill to his cell. Hemphill told Surber he wanted to go to the facility's medical clinic, and Surber allegedly responded, "Shut up and go to your cell, you're keep lock."

After some time passed, CO Straley allegedly went to Hemphill's cell and told him he was not, in fact, under keeplock. Hemphill says he asked Straley for medical attention, but she ignored his request. Subsequently, he obtained a pass to the clinic from another officer. On his way to the clinic, he encountered CO Gunderman, who allegedly demanded, "What do you think you're doing?" When Hemphill presented his pass and indicated he was on his way to the clinic, Gunderman allegedly responded, "No you're not, get in here." Gunderman then took Hemphill back to the room where he initially had been assaulted. Surber was there, and punched Hemphill in the stomach, saying, "I gave you a break by not writing you up for sexual harassment on a female officer, but you want to be stupid." At some point during the assault, Hemphill asked what he had done, and Surber told Hemphill that he knew Hemphill had "sexually harassed" Straley by "ask[ing] her for a

kiss." Surber and Gunderman then allegedly "beat[ ] plaintiff down to the ground."

According to Hemphill, Sergeant Williams entered the room at this point but did not intervene when Hemphill requested his help in calling off the officers. After Surber allegedly punched Hemphill again in the ribs, Williams left the room. Sergeant Keyser came into the room and Hemphill was ordered to place his hands against the wall. He says Surber then pressed his head into the wall and stated, "if [you] want to write this up you do it from SHU [Special Housing Unit]." Surber said he had given the plaintiff "a break by not bringing charges against him" and threatened that if Hemphill "pursue[d] this any further," Surber would bring criminal charges against him for assaulting an officer. Surber warned that he had "officers who would testify to that effect." Straley subsequently entered the room, and said, "That's him. He asked me for a kiss." Surber then stated, "You better make up your mind right now, drop it or go to the box and face criminal charges. You don't go to the clinic, you don't do nothing but drop it; if you['re] lying I will have all my night officers watching your every move. If you go to the clinic, I will know about it and then I'll make your life a living hell throughout this penal system because I have friends all over." Hemphill asserted in his complaint that "with fear of being assaulted by the defendants [he] agree[d] to their threats so that he wouldn't be tortur[ed] any more."

In April 1998, Hemphill apparently wrote a letter to the Green Haven Superintendent, Christopher Artuz, which was submitted to the district court but never placed in the record, for reasons that are not clear. In her Report and Recommendation of July 12, 2001, the magistrate judge described the letter as follows: "This letter informs [the superintendent] that plaintiff 'intends to bring criminal charges' against the corrections officers who are named as defendants in the present civil action. The letter states that the named officers assaulted plaintiff on November 18, 1997, covered up the assault by failing to issue the appropriate reports, and deprived plaintiff of medical care on two occasions."[5]

Hemphill thereafter brought this suit against the State of New York, COs Surber, Kelly, Gunderman, Straley, Miller, Boss, and Sergeant Williams. The defendants denied Hemphill's allegations in their answer. On July 12, 1999, the district court, on sovereign immunity grounds, dismissed Hemphill's claims against the state of New York and against the individual defendants to the extent that he sought money damages against them in their official capacities. But it left standing Hemphill's claims brought against the individual defendants, in their private capacities. On December 28, 1999, the defendants moved for summary judgment as to these, arguing that Hemphill had not satisfied the PLRA's exhaustion requirement. The magistrate judge recommended granting summary judgment on Hemphill's medical indifference claims, but denying it on Hemphill's excessive force claim both on the merits and because, before the Supreme Court decided *Porter v. Nussle,* the PLRA's exhaustion requirement was inapplicable to excessive force claims in this circuit. *See Nussle v. Willette,* 224 F.3d 95 (2d Cir.2000).

On March 8, 2001, the district court adopted the magistrate judge's recommendation of January 30, 2001 as to the excessive force claim, but remanded the medical

---

**5.** The magistrate judge also indicated in her Report and Recommendation that Judge McMahon had attached the letter to her March 7, 2001 Decision and Order, but the letter does not appear in the plaintiff's appendix.

indifference claim to the magistrate judge for further findings. In doing so, the court asked whether Hemphill's letter to the Superintendent "qualifies as an attempt to exhaust his administrative remedies as to all his grievances, including his claim of deliberate indifference to his medical needs." The answer, Judge McMahon noted, depended upon the requirements of Green Haven's inmate grievance procedure.

In her July 12, 2001 Report and Recommendation the magistrate judge, adhering to the earlier recommendation, pointed out that Hemphill had acknowledged in his deposition that he had not filed a grievance. She also stated that Hemphill had "not suggested that he was unaware of the Grievance Procedure, or that he was directly prevented from utilizing the process." The magistrate judge concluded, *inter alia,* that Hemphill's letter to Artuz "fail[ed] to comply with the specific and detailed process which an inmate must follow in order to exhaust his or her administrative remedies."

In an April 2002 decision and order dismissing Hemphill's medical indifference claim, Judge McMahon agreed with the magistrate judge, and rejected Hemphill's argument that his letter to Artuz sufficed to exhaust his remedies. Artuz's failure to respond to Hemphill's letter did not matter, the court ruled, since Hemphill had not followed either the three-tiered regular grievance procedure, or the expedited process for harassment claims. "Under this expedited procedure," Judge McMahon wrote, "a grievance is filed with both the Inmate Committee and the harassing employee's supervisor. If the grievance raises a bona fide harassment issue (as this one would have), Level 1 review is bypassed and the matter is sent directly to the Superintendent for review. Had plaintiff utilized this procedure, any failure by Artuz to render a decision on his matter within twelve working days could have been appealed to Albany, thus completing the grievance cycle and exhausting his remedies in a matter of weeks." *Hemphill v. State of New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002). Even if plaintiff's letter could be interpreted as a grievance, the judge observed, it was untimely, and Hemphill did not file for an extension of time. *Id.* The district court did not address the question of whether Hemphill's allegations that COs threatened retribution should he complain about his treatment might excuse his failure to comply with normal procedures.

Seven days later, in view of the Supreme Court's decision in *Porter v. Nussle,* the district court dismissed the rest of Hemphill's complaint on similar exhaustion grounds. Hemphill filed a timely notice of appeal.

On April 15, 2004, appellees' counsel sent a Rule 28(j) letter notifying the court that DOCS had, as of April 14, 2004, amended 7 N.Y.C.R.R. § 701.11(b)(1), the regulatory provision describing the expedited grievance procedure for complaints about "employee harassment," to add the underlined text and delete the bracketed text:

> *An inmate who wishes to file a grievance complaint that alleges employee harassment shall follow the procedures set forth in section 701.7(a)(1) above.* Note: An inmate who feels that s(he) has been the victim of employee misconduct or harassment should [first] report such occurrences to the immediate supervisor of that employee. *However, this is not a prerequisite for filing a grievance with the IGP.* [This does not preclude submission of a formal grievance.]

The letter stated that, "[a]s amended, section 701.11(b)(1) confirms DOCS's view, at issue in this appeal ... that a prisoner cannot obtain the expedited review provid-

ed by section 701.11 without first submitting a formal grievance pursuant to 7 N.Y.C.R.R. § 701.7(a)(1). DOCS intends the amendments to ... clarify, not change, the requirements for section 701.11 review. These amendments are among various amendments to the IGP regulations that[, in the words of DOCS's Notice of Proposed Rule Making,]

> merely clarify text in areas where there has been confusion resulting from ambiguity in the current text. Increased litigation in this area and numerous judicial opinions setting forth sometimes inconsistent analysis of the provisions of this regulation have been, on occasion, contrary to the department's interpretation, intention or existing practice. These clarifying changes reflect the policies and procedures the department has followed and have been in place at least since the last general changes were adopted effective May 4, 1994; they are not intended to change program policies." [Rule 28(j) letter at 1–2]

## II. Discussion

■ Read together, our recent decisions, and our holdings today in the other consolidated cases, suggest that a three-part inquiry is appropriate in cases where a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies as required by the PLRA, 42 U.S.C. § 1997e(a). Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, 2004 WL 1842647. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, 2004

WL 1842669, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba,* 366 F.3d at 163. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d 670, 2004 WL 1842652 (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir. 2003); *Rodriguez* order).

We consider each of these questions in turn with respect to the plaintiff before us.

### A. Availability of Administrative Remedies

■ We hold today in *Abney v. McGinnis* that, in some circumstances, the behavior of the defendants may render administrative remedies unavailable. To the extent that the plaintiff lacked "available" administrative remedies, the PLRA's exhaustion requirement is inapplicable. In *Abney,* the plaintiff obtained a favorable resolution of his grievance, and therefore did not appeal the prison's disposition of the grievance. By the time he discovered that the favorable decision was not being implemented, the deadline for appealing the administrative ruling had come and gone. On these facts, we held that all available administrative remedies had been exhausted. *Abney,* citation.

On the facts before us, administrative remedies were "available" to Hemphill at the outset; that is, the prison provided grievance procedures that inmates claiming excessive force could utilize.[6] As ex-

---

**6.** We note, however, that if Hemphill wrote in     a timely fashion to the Superintendent pursu-

plained above, DOCS provided both a regular grievance mechanism and a special expedited process for resolving prisoner complaints of staff misconduct. We therefore cannot say that administrative remedies were originally unavailable to Hemphill.

But this does not end the inquiry into availability. Hemphill claims that the threats against him were such that remedies that may have been nominally available were not so in fact. This argument can be made in two ways: First, that the threats rendered all administrative remedies unavailable; and second, that because of the threats some procedures that would ordinarily be available were effectively unavailable. We do not understand Hemphill to be making the first argument, for he emphasizes that he did write a grievance letter to Superintendent Artuz. He clearly does, however, make the second contention—that his letter to Artuz, at the time he made it, constituted the only administrative remedy that, in view of the threats he was subjected to, was functionally available to him.

In reply, defendants assert first that Hemphill forfeited this argument by not raising it below in answer to the defendants' motion for summary judgment. We find that contention unavailing.

It is well-established that "when [a] plaintiff proceeds *pro se* ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations." *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Hemphill's complaint specifically recounted Surber's threatening statements, and the plaintiff's acquiescence. So the question of forfeiture turns on whether Hemphill needed expressly to reiterate his claim concerning threats in his opposition to defendants' summary judgment motion. We hold that he did not, for two reasons.

First and foremost, the defendants' memorandum of law in support of their motion for summary judgment made no mention of Hemphill's allegations that Surber's threats inhibited Hemphill's use of regular grievance mechanisms. Rather, their motion papers were based only on the propositions (a) that Hemphill's letter to Superintendent Artuz did not suffice to exhaust his administrative remedies for the purposes of the PLRA, and (b) that the Supreme Court's holding in *Porter v. Nussle* applied retroactively. Hemphill's submission in opposition to defendants' motion for summary judgment sought to refute the defendants' arguments on these points. Since the defendants did not dispute, in their summary judgment motion, Hemphill's allegations regarding Surber's threats and their impact on his grieving,

---

ant to a possibly valid interpretation of DOCS grievance procedures, there might be a question as to the availability of remedies, since Hemphill received no response to his letter, and there is no indication in the record that his grievance was ever recorded, as required by DOCS regulations. *Cf. Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir.2002) ("agree[ing] with other circuits] that the failure to respond to a grievance within the time limits contained in the grievance policy renders an administrative remedy unavailable"); *Lewis v. Washington,* 300 F.3d 829, 833 (7th Cir.2002) (stating that prison's failure timely to respond renders administrative remedies

unavailable); *Foulk v. Charrier,* 262 F.3d 687, 698 (8th Cir.2001) (holding that defendants failed to prove non-exhaustion where they presented no evidence to refute plaintiff's contention that he could not pursue grievance further after warden did not respond to his grievance); *Underwood v. Wilson,* 151 F.3d 292, 295 (5th Cir.1998) (holding that "available administrative remedies are exhausted when the time limits for the prison's response set forth in the prison Grievance Procedures have expired"). We express no view on whether Hemphill's allegations can support such a theory.

Hemphill was not obliged to discuss those allegations in his opposition papers in order to preserve the argument.

■ Moreover, at the time that Hemphill filed his summary judgment papers, we had not yet held, as we did subsequently in *Ziemba*, that prison officials' threats or other inhibiting conduct may estop defendants from asserting the affirmative defense of non-exhaustion. Nor was it clear that "special circumstances" might excuse a prisoner's failure to exhaust available remedies, *Berry*, 366 F.3d at 88; *Rodriguez*; *Giano*. And we had not ruled, as we do today in *Abney*, that some circumstances may render seemingly accessible remedies, in fact, unavailable. A plaintiff, particularly a prison inmate proceeding *pro se*, cannot be expected to have anticipated the availability of these doctrines. In answering the defendants' summary judgment motion, Hemphill justifiably tried to counter the arguments defendants made and did so on the basis of the law as it was then established.

Under the circumstances, we conclude that he did not forfeit the argument that Surber's threats prevented or deterred him from filing a level 1 grievance.

■ Defendants also argue, however, that the fact that Hemphill sent a letter to Superintendent Artuz and filed this suit means that he was not—as a matter of law—sufficiently frightened as to render normal grievance procedures unavailable. This contention too must be rejected. The test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would "a similarly situated individual of ordinary firmness" have deemed them available. *Cf. Davis v. Goord*, 320 F.3d 346, 353 (2d Cir.2003) (articulating the "individual of ordinary firmness" standard in the context of a prisoner retaliation claim). Moreover it should be pointed out that threats or other intimidation by prison officials may well deter a prisoner of "ordinary firmness" from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts. This may be so, if for no other reason, because seeking a criminal investigation or filing a civil rights complaint may enable an inmate to draw outside attention to his complaints, thereby neutralizing threatened retaliatory conduct from prison employees.

On all of these grounds, we cannot say at this time that the remedies that Hemphill failed to pursue were actually available to him. As a court of appeals dealing with a limited record, however we are also not in the position to conclude that they were not available. For that reason, we believe that a remand to the district court, on the question of whether some seemingly available remedies were rendered unavailable by the threats Hemphill received, is appropriate. But because the standard for, and consequences of, unavailability are potentially different from those of either estoppel or justification, we must turn to Hemphill's arguments as to these.

### B. Estoppel

Hemphill contends that, under *Ziemba*, Surber's threats should estop the defendants from presenting an affirmative defense of non-exhaustion. In *Ziemba*, the plaintiff alleged that prison officials prevented him from exhausting his administrative remedies by beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility. 366 F.3d at 162. We vacated and remanded the district court's judgment on the pleadings "because the district court erroneously did not address [the plaintiff's] claim that defendants' actions may have estopped the

State from asserting the exhaustion defense." *Id.* at 163. Similarly, Hemphill argues that Surber told Hemphill that "[he]'d better drop it," warned that if Hemphill "pursue[d] this any further," Surber would bring criminal charges against him, and promised that if Hemphill sought medical attention, Surber would "know about it and ... make your life a living hell throughout this penal system." In the face of such alleged verbal and physical threats, and "with fear of being assaulted [further] by the defendants," Hemphill asserts that he "agree[d] to their threats so that he would not be torture[d] any more."

The district court granted summary judgment on Hemphill's section 1983 suit before our ruling in *Ziemba.* Under the circumstances, we deem it appropriate to remand the case to that court so that it may consider whether the defendants' non-exhaustion defense is barred by equitable estoppel. In doing so, we note that there are several defendants in this case, each of whom apparently played a somewhat different role in the alleged assault on Hemphill. As a result, depending on the facts pertaining to each defendant, it is possible that some individual defendants may be estopped, while others may not be. We, of course, take no position on this question, leaving it to be determined by the district court in the first instance.

## C. "Special Circumstances" Justifying Failure to Exhaust

Since the district court's ruling in *Hemphill,* we have held that "there are certain 'special circumstances' in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified." *Giano,* citation (citing *Berry,* 366 F.3d at 88; *Rodriguez* order at 1). In *Giano,* the "special circumstances" justifying the plaintiff's failure to exhaust consisted of his reasonable interpretation of DOCS regulations. Accordingly, we remanded the case to the district court for dismissal (without prejudice) if prison authorities would still allow the plaintiff to pursue the administrative remedies he had reasonably believed to be unavailable to him. But we instructed the court to permit the plaintiff to proceed with his suit if it turned out that, as a result of a time-bar or other restriction, the administrative remedies were now unavailable to him.

In the case before us, as in *Giano,* the plaintiff asserts that his attempt to exhaust available administrative remedies by writing directly to Superintendent Artuz comported with DOCS procedural rules, or, at a minimum, reflected a reasonable interpretation of those regulations. At the very least, Hemphill asserts, DOCS regulations describing the expedited grievance procedure were manifestly unclear, and he justifiably interpreted them to allow him to seek relief directly from the Superintendent. The regulations governing expedited grievance procedures that were then in effect, Hemphill contends, nowhere explicitly required inmates to file a level 1 grievance in cases of employee misconduct. Rather, they simply advised that inmates "should" report the misconduct to the offender's immediate supervisor, and noted that such a complaint did not "preclude the filing of a formal grievance." Moreover, Hemphill contends that DOCS's recent clarificatory amendments to the expedited grievance procedure regulations suggest their initial lack of transparency. The amendments make clear that inmates seeking expedited review of employee misconduct grievances are required to file a level 1 grievance as prescribed by 7 N.Y.C.R.R. § 701.7(a), and that complaining to the employee's immediate supervi-

sor is "not a prerequisite for filing a grievance with the IGP." [7]

Hemphill's arguments about the lack of clarity in DOCS regulations are not manifestly meritless. Accordingly, having held in *Giano* that reliance on a reasonable interpretation of prison grievance regulations may justify an inmate's failure to follow procedural rules to the letter, we believe it appropriate to remand the instant case to the district court to allow it to consider, in light of *Giano*, this possible justification for Hemphill's failure to follow normal grievance procedures.

■ Further, in view of our decisions in *Giano*, *Berry*, and *Rodriguez*, the court should also determine, even if some or all of the defendants are not estopped from asserting non-exhaustion as an affirmative defense, and even if Surber's threats did not suffice to render the grievance procedures actually unavailable to Hemphill, whether the threats themselves justified Hemphill's failure to file a grievance in the manner prescribed by DOCS. Once again, the appropriate standard for determining whether Hemphill's fear of retaliation justified his sending a letter to Artuz rather than filing a level 1 grievance is the same as is applicable in cases of retaliation; that is, whether "a similarly situated individual of ordinary firmness," *see Davis v. Goord*, 320 F.3d at 353, would have been deterred from following regular procedures. And, like an inmate claiming retaliation, Hemp-

hill "should have the opportunity to develop facts that would demonstrate that [defendants' actions] would deter a reasonable inmate from pursuing grievances." *Id.* at 354 (internal quotation marks and citation omitted).[8]

We also note that, in determining whether "special circumstances" justified Hemphill's failure to exhaust, the district court should consider the interplay between Surber's threats and Hemphill's decision to write directly to Superintendent Artuz, rather than filing a level 1 grievance. Given Surber's alleged warning of retaliation, it is arguable that Hemphill may have reasonably concluded that writing directly to the Superintendent involved an acceptable level of risk, whereas filing a level 1 grievance or notifying the immediate supervisors of his purported attackers was too fraught with danger.

If the district court determines that Hemphill failed to exhaust according to DOCS regulations, but that this failure was justified, the court must ask whether administrative remedies are still available to the plaintiff. If it appears that such remedies are available—for instance, if Hemphill may now file an untimely grievance—then the district court must dismiss his complaint without prejudice. It must, in addition, make that dismissal subject to reinstatement if the remedies turn out to be unavailable. Under this scenario, Hemphill must still try to exhaust the

---

7. The plaintiff also points to statements by DOCS official Thomas Eagen, which, according to Hemphill, indicate that the DOCS regulations in effect at the time of the alleged assault on him did not require prisoners *both* to file a formal grievance *and* to report staff misconduct to the offending employee's immediate supervisor.

8. The consequences of finding a *justification* (based on threats) for failing to file an ordinary grievance are different from those of a finding that threats rendered ordinary griev-

ance procedures *unavailable*. The latter automatically means that the PLRA requirements have been met. The former results in the rather more complicated "conditional" decree we issued in *Giano*. It seems likely, therefore, that facts sufficient to support a conclusion that an inmate was "justified" in not following ordinary procedures will be less powerful than those which would lead to a holding that those procedures were not available. Because we need not decide that question at this time, however, we do not do so.

available administrative remedies before filing suit. If, instead, administrative remedies are no longer available to him, then, since he was justified in his prior failure to exhaust, Hemphill may proceed with his suit without further ado. *Giano,* citation.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is VACATED and the case is REMANDED for further proceedings, in which, consistent with this opinion, the district court must determine (a) to what extent were the remedies Hemphill failed to pursue in fact available; (b) whether, if they were available, some or all of the defendants were estopped from raising Hemphill's failure to pursue them, and (c) whether, if remedies not pursued were available and some of the defendants were not estopped from raising Hemphill's failure to exhaust, Hemphill was nonetheless justified, at the time, in not pursuing the available remedies.