# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 03-3531

KARAMO B. KABA,

*Plaintiff-Appellant,*

*v.*

E.A. STEPP, MICKAL E. LAIRD,
DAVE BENSON, and JOSEPH YONKMAN,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 01-150-GPM—**G. Patrick Murphy**, *Chief Judge.*

ARGUED NOVEMBER 30, 2005—DECIDED AUGUST 16, 2006

Before ROVNER, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* Karamo Kaba served time as an inmate in the federal prison in Marion, Illinois. He contends that during his incarceration his case manager, Mickal E. Laird, denied him grievance forms, threatened him, and solicited other inmates to attack him in retaliation for filing grievances, and that the other named officials knew about and did nothing to stop Laird's activities until after Kaba was actually beaten in his cell on February 23, 2001. He contends these actions violated the Eighth Amendment.

The district court granted summary judgment for the prison officials, finding that Kaba failed to exhaust his

administrative remedies as required by the Prison Litiga-
tion Reform Act (PLRA), 42 U.S.C. § 1997e(a). Because
we find there are disputed issues of fact about whether
administrative remedies were "available" to Kaba, we
reverse and remand for proceedings consistent with this
opinion.

## I

As a preliminary matter, although no party addressed
this issue, we note that the district court after granting
summary judgment dismissed Kaba's case without preju-
dice. Normally, a dismissal without prejudice is not a
final order for purposes of appellate jurisdiction under 28
U.S.C. § 1291. See *Hoskins v. Poelstra*, 320 F.3d 761, 763
(7th Cir. 2003). "We have even gone so far as to state that
dismissals without prejudice are 'canonically non-final.'"
*Glaus v. Anderson*, 408 F.3d 382, 385 (7th Cir. 2005)
(quoting *Am. States Ins. Co. v. Capital Assoc. of Jackson
County, Inc.*, 392 F.3d 939, 940 (7th Cir. 2004)). But "if
an amendment would be unavailing, then the case is dead
in the district court and may proceed to the next tier."
*Hoskins*, 320 F.3d at 763. See *Glaus*, 408 F.3d at 386
("There is an exception if there is no amendment a plain-
tiff could reasonably be expected to offer to save the com-
plaint, or if a new suit would be barred by the statute of
limitations.") (quotation altered); *Dixon v. Page*, 291 F.3d
485, 488 (7th Cir. 2002) (holding that where an inmate has
been released, the prison grievance system is no long-
er available for exhaustion and the defect in the com-
plaint cannot be cured, and therefore the dismissal is final);
*Dolis v. Chambers,* 2006 WL 2042536, at *1 (7th Cir. July
24, 2006).

In this case, as in *Dixon*, Kaba was released from prison,
and therefore the dismissal without prejudice for failure to
exhaust is effectively a final order because no amend-

ment could resolve the problem. (Even though exhaustion would no longer be a problem if he were to re-file, because that rule applies only to prisoners, he would in all likelihood face the same kind of statute of limitations problems that the inmate in *Dixon* confronted.) Even if Kaba were still incarcerated, it would be impossible for him to exhaust at this late date. The prison grievance system has a specific set of procedures and deadlines, and any deadline for filing and/or appealing a grievance for events that occurred in 2000 and 2001 is long passed. See *Woodford v. Ngo*, 126 S. Ct. 2378 (2006). Therefore, the dismissal is in effect final and this court may consider Kaba's appeal.

Kaba filed his initial and amended *pro se* complaints citing both *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and 42 U.S.C. § 1983 (plainly not applicable here) against four officials at the federal prison in Marion, Illinois, in both their individual and official capacities. The magistrate judge dismissed the official capacity claims because he found that the substance of the complaint was a *Bivens* action alleging Eighth Amendment claims and did not include any claim cognizable under the Federal Tort Claims Act (FTCA). The prison officials filed a motion to dismiss, which the district court converted to a motion for summary judgment and granted. The district court also refused to permit Kaba to amend his complaint to re-assert his FTCA claim against the United States, which would be the proper defendant for tort claims involving acts of the named officials within the scope of their employment. See 28 U.S.C. § 2679(d).

As we review the district court's grant of summary judgment, it is important to remember that exhaustion is an affirmative defense, and consequently the burden of proof is on the prison officials. See *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). Furthermore, review of a district court's exhaustion finding is *de novo*. *Id.* As with any review of a case upon summary judgment, we draw all

reasonable inferences in the light most favorable to the non-moving party. See *Jenkins v. Yager*, 444 F.3d 916, 921 (7th Cir. 2006). Furthermore, as a *pro se* litigant, Kaba is entitled to have his complaint be liberally construed. See *Marshall v. Knight*, 445 F.3d 965, 969 (7th Cir. 2006).

Finally, though we have warned against this practice repeatedly in our opinions, the respondents in this case fall into the trap of trying to discredit Kaba's affidavits as "self-serving." As we have said before, "[m]ost affidavits are self-serving, as is most testimony, and this does not permit a district judge to denigrate a plaintiff's evidence when deciding whether a material dispute requires trial." *Wilson v. McRae's, Inc.*, 413 F.3d 692, 694 (7th Cir. 2005). See *Dalton v. Battaglia*, 402 F.3d 729, 735 (7th Cir. 2005) ("We have repeatedly stated that the record may include a so-called 'self-serving' affidavit provided that it is based on personal knowledge."); *Payne v. Pauley*, 337 F.3d 767, 772-73 (7th Cir. 2003). Sworn affidavits, particularly those that are detailed, specific, and based on personal knowledge are "competent evidence to rebut [a] motion for summary judgment." *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004) (*per curiam*).

## II

With the standard of review in mind, we turn to the particulars of Kaba's case. Kaba was incarcerated in the federal prison in Marion, Illinois, from November 2000 through March 2001, when he was transferred. The Marion facility, like all federal prisons, has a multi-step administrative grievance process for inmate complaints. First, an inmate must attempt to resolve his complaint informally, although that step may be waived at the warden's discretion if the "inmate demonstrates an acceptable reason for bypassing such informal resolution." 28 C.F.R. § 542.13(a), (b). If the informal route fails, the inmate has 20 days from

the complained-of event to file a written Administrative Remedy Request on the appropriate form to the warden. 28 C.F.R. § 542.14(a). Where the inmate can demonstrate a "valid reason for delay," an extension of time may be warranted. 28 C.F.R. § 542.14(b). To file the grievance, the inmate must first obtain the appropriate grievance form from the institution staff, "ordinarily, the correctional counselor." 28 C.F.R. § 542.14(c)(1). "If the inmate reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director." 28 C.F.R. § 542.14(d)(1). Finally, if not satisfied with the resolution of the grievance, the inmate may file a written appeal to the Bureau of Prisons' Regional Director and, if still not satisfied, then to its General Counsel. 28 C.F.R. § 542.15(a). Each of these steps has a prescribed deadline and a particular grievance form outlined in the Code of Federal Regulations, but we need not get into these details because Kaba concedes that he did not pursue the "prison grievance procedures up to the top level." *Carroll v. Yates*, 362 F.3d 984, 984 (7th Cir. 2004). At issue before us is why.

Kaba contends that these administrative remedies were not "available" to him because his life was threatened. Kaba's evidence includes three sworn affidavits proffering his own testimony, a prison-administered lie detector test that indicates that he was truthful in the first affidavit, the affidavit of another inmate, and the documentation by a doctor of Kaba's reported fears about being transferred back to Marion. Together this evidence details a series of events—including the withholding of grievance forms, direct threats, and an inmate assault—from about November 2000 to February 2001 that Kaba contends made it impossible for him to file grievances about the administrative remedy system itself and the complained-of retaliatory actions by

Laird and the other officials. Kaba's affidavits are specific and detailed and, to the extent that they are based on his personal knowledge, they are admissible as evidence, just as the prison officials' own affidavits are.

Taking this evidence in the light most favorable to Kaba, it shows that Laird threatened Kaba repeatedly. The first time Kaba asked Laird for a grievance form, Laird not only refused to give him the form but also seized his tennis shoes; when Kaba asked an associate warden about his shoes they were returned. When Laird learned of the conversation with the associate warden, he visited Kaba's cell and told him, "I told you if you go to the Warden or Associate Warden, I will see to it that you will never get a transfer." A few days later, Laird approached Kaba as he was leaving the dining area and told him that the associate warden "has left, now you will never get transferred, I will keep locking you up or whatever I need to do." In addition, Laird told Kaba on another occasion, "You don't talk to the Warden or Associate Warden and you don't ask for [grievance forms]." Laird told him that he had to get grievance forms from the prison paralegal, although no paralegal was employed at Marion.

Two different inmates, James Barnett and Homer Richards, told Kaba that Laird had talked to them about Kaba. Barnett, the other inmate who submitted a sworn affidavit, told Kaba that Laird had approached him three times (although only two are mentioned in the undated affidavit taken during the prison's internal investigation). During the first two encounters, Laird told Barnett that Kaba was "not a good person" because he was filing too many grievances, that Laird wanted Kaba "out of the unit," and that Kaba "need[ed] to be beat up or assaulted." According to Kaba, the third incident occurred after Kaba had complained to the warden and an investigation had started. Barnett told Kaba that Laird was "applying pressure" to get Barnett to stab Kaba because he had com-

plained to the warden and cooperated with the investigation, and Laird had promised extra phone calls, food, and even possibly a transfer to induce Barnett to stab him. Richards warned Kaba to "leave Laird alone," because "Laird will retaliate against everyone," and Laird had told Richards to get Kaba "off his back." As part of the internal prison investigation conducted prior to the beating, Kaba passed a polygraph examination in which he was asked about the truthfulness of his first affidavit, which was signed on January 12, 2001.

Kaba detailed how he attempted to deal with the situation by specifically informing Warden Stepp and Captain Benson of the threats. In December 2000, Kaba spoke to Stepp about the issue and was assured that Stepp would take care of it. When Kaba tried to bring this to the attention of the new associate warden, "Captain [Benson] stepped up and told me that if I keep filing paperwork, I would never move out of Marion." Kaba also indicated that Benson told him that "if you file [an] administrative remedy I will ship you to [Puerto Rico]. You will get beat up with [a] stick." On January 12, 2001, Yonkman, the agent in charge of the prison's internal investigation, visited Kaba, and Kaba again raised the issue of the threat, but "nothing was done to protect me . . . until I was assaulted." Stepp also told Kaba not to file a grievance about Laird's actions or else Stepp would not send anyone to investigate.

Just as Kaba feared, he was attacked in his cell severely enough to leave him unconscious from blunt trauma to the head, which required a brief hospitalization. Some of Kaba's legal materials were confiscated the day of his assault. Following his transfer to the federal penitentiary in Springfield, Missouri, which was done to allow him to obtain medical treatment in the aftermath of the attack, Kaba's doctor documented on April 18, 2001, that Kaba told him that he feared being returned to Marion because a correctional officer was paying other inmates to assault him.

Kaba was no stranger to the grievance procedure. During his time at Marion, he had filed quite a few, including one on November 8, 2000, about the inmate financial responsibility program, one on November 29, 2000, on the same program, and one on February 16, 2001, dealing with the qualifications of the staff. In addition, after the beating, on March 6, 2001, Kaba filed an FTCA claim with the Bureau of Prisons at the U.S. Department of Justice. (That claim was officially denied on December 6, 2001; the letter Kaba received informing him of this action also notified him that he had the right to sue within six months of the date of the letter.) On March 12, 2001, long before he learned the result of his FTCA complaint, he filed this suit in federal court. He was transferred from the Marion prison on March 21, 2001. He filed additional grievances beginning in May 2001, although none appears to have focused on the previous denial of administrative remedies or threats and attack at the Marion prison.

Without grappling with Kaba's proffered evidence, the district court found that Kaba could have filed grievances about Laird for the three months prior to his beating, and that he did in fact file grievances during this period although none addressed the retaliation. In addition, the district court noted that Kaba filed this lawsuit a mere 17 days after that beating, while he still had three days left to file a formal grievance under 28 C.F.R. § 542.14(a). While the court rejected an absolute rule that filing a lawsuit before the grievance period had expired necessarily constituted a failure to exhaust, it was persuaded that Kaba could have exhausted but opted to file a lawsuit instead. It noted that Kaba was physically able to file the proper paperwork and that he could have filed a grievance directly with the Regional Director if he felt that he remained in jeopardy. See 28 C.F.R. § 542.14(d)(1).

### III

The Prison Litigation Reform Act (PLRA) provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility *until such administrative remedies as are available are exhausted.*

42 U.S.C. § 1997e(a) (emphasis added).

As the Supreme Court recently said in *Ngo,* "A centerpiece of the PLRA's effort 'to reduce the quantity . . . of prisoner suits' is an 'invigorated' exhaustion provision, § 1997e(a)." 126 S. Ct. at 2382 (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). Prisoners must exhaust even where the relief sought cannot be granted in the administrative process. *Ngo*, 126 S. Ct. at 2382-83. "The PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Id.* at 2387 (quoting *Nussle*, 534 U.S. at 525). Nonetheless, the exhaustion requirement is not jurisdictional. *Ngo*, 126 S. Ct. at 2392. If administrative remedies are not "available" to an inmate, then the inmate cannot be required to exhaust. Thus, "[c]orrections officials concerned about maintaining order in their institutions have a reason for creating and retaining grievance systems that provide—and that are perceived as providing—a meaningful opportunity for prisoners to raise meritorious grievances." *Id.*

Because the PLRA does not say when a process is "available," the court must apply the ordinary meaning of the term. See *Asgrow Seed Co. v. Winterboer,* 513 U.S. 179, 187 (1995). In *Ngo*, the Supreme Court rejected the idea that, for example, a process becomes unavailable because the prisoner does not comply with the procedural rules

and therefore cannot obtain relief, and required courts to look at the reason why the administrative process is unavailable. 126 S. Ct. at 2387, 2392-93. Thus, when the prisoner causes the unavailability of the grievance process by simply not filing a grievance in a timely manner, the process is not unavailable but rather forfeited. On the other hand, when prison officials prevent inmates from using the administrative process detailed in the Code of Federal Regulations, the process that exists on paper becomes unavailable in reality. Thus, as we held in *Dale*, when prison officials fail to provide inmates with the forms necessary to file an administrative grievance, administrative remedies are not "available." 376 F.3d at 656. The Third Circuit reached a similar conclusion in *Brown v. Croak*, 312 F.3d 109, 111-12 (3d Cir. 2002), which held that administrative remedies were unavailable where the prison officials erroneously told the prisoner that he must wait until the investigation was complete before filing a grievance. See also *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001). Most recently, we observed, "Prison officials may not take unfair advantage of the exhaustion requirement, [ ] and a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." *Dole v. Chandler*, 438 F.3d at 809.

While we have not laid out a particular test for deciding when administrative remedies are unavailable, the Second Circuit has opted for an objective test, under which the court looks at whether "a similarly situated individual of ordinary firmness" would have deemed the grievance procedures to be available." *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004). It offered the following explanation:

> [I]t should be pointed out that threats or other intimidation by prison officials may well deter a prisoner of "ordinary firmness" from filing an internal grievance,

but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts. This may be so, if for no other reason, because seeking a criminal investigation or filing a civil rights complaint may enable an inmate to draw outside attention to his complaints, thereby neutralizing threatened retaliatory conduct from prison employees.

*Id.*

In *Dale*, the inmate alleged that the prison officials had failed to protect him from an attack by other inmates; when he attempted to file a grievance, he was told that the employees did not have grievance forms and instead was given blank sheets of paper. 376 F.3d at 654-55. During the grievance period, the inmate was transferred, and the guard at the new prison told him that grievance forms could be obtained only from the unit team or if the warden permitted it. Given the timing of his transfer, he was unable to file a grievance within the appropriate period. *Id.* at 655. The district court rejected Dale's evidence, discounting his affidavit as "bald assertions" even though Dale had provided detailed information about the specific form he had requested, the prison employees from whom he requested forms, and the receipt of blank paper instead of forms. *Id.* at 655-56. This court observed:

> If prison employees refuse to provide inmates with those forms when requested, it is difficult to understand how the inmate has any available remedies. Just as prison employees cannot exploit the exhaustion requirement by not responding to grievances, see *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002), they should not be rewarded for preventing an inmate access to an administrative remedy, see *Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003) (holding that district court erred in failing to consider prisoner's claim that he was

unable to submit a grievance, and therefore lacked available administrative remedies, because prison employees refused to provide him with the necessary forms); *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001) ("[A] remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a)." (alteration in original)). The defendants in this case have yet to give any reason why Dale was refused the forms he requested, or to explain how he could use the administrative grievance system without the forms mandated for that purpose.

*Id.* at 656.

The prison officials in Kaba's case argue that no reasonable factfinder could find that administrative remedies were not available to him, because he filed three grievances while at Marion prior to the attack, including the one several days before the beating, and he filed both an FTCA claim and this lawsuit within days of the attack. Kaba counters that he attempted to file grievances up to and through the attack, but that he was denied forms, intimidated into not pursuing formal grievances, and retaliated against for attempting to pursue administrative relief. The attack in his cell, he points out, is exactly what the staff had threatened would happen if he kept on filing grievances about them. In essence, Kaba takes the position that all grievances are not alike and that it was unrealistic to expect him to file a grievance against the very people who were threatening retaliation and preventing him from obtaining the proper forms.

We agree with Kaba that a more discriminating analysis is necessary. The ability to take advantage of administrative grievances is not an "either-or" proposition. Sometimes grievances are clearly available; sometimes they are not; and sometimes there is a middle ground where, for example, a prisoner may only be able to file grievances on certain

topics. Kaba contends that he could obtain grievance forms and file them only if he pre-disclosed the topic of the grievance to the prison officials, and that they would not provide the form if he intended to file a grievance against them. In addition, there is an important temporal element: while administrative process may have been available at the beginning of Kaba's tenure at Marion, he claims that it became progressively less available with each incident detailed, until at some point, whether before or after the attack in Kaba's cell, it became actually unavailable.

Viewing the evidence in a light most favorable to Kaba, we cannot say that the prison officials met their burden of proving the availability of administrative remedies. We have no doubt that the Bureau of Prisons, including the prison in Marion, has a formal process. But it is unclear based on the evidence before us whether Kaba could avail himself of it. There is no dispute that Kaba was beaten; that Laird was removed from the unit for an undisclosed reason; and that if Kaba had filed a grievance after his transfer from Marion, it would have been tardy under the rules. The evidence that Kaba proffered in opposition to summary judgment indicates that he was denied the necessary forms and beaten by other inmates after instigating an investigation and filing his third grievance. The warden told him that if he filed a grievance about Laird's actions, the prison's internal investigation of his allegations would stop (a statement not much different than that in *Croak*, 312 F.3d at 111-12, where the prison officials erroneously told the prisoner that he must wait until the investigation was complete before filing a grievance). The prison officials naturally dispute Kaba's account, and we are obviously making no finding here about which side is correct.

The attack itself may have transformed the remedies from available to unavailable, for an ordinary prisoner in Kaba's shoes. The fact that he was able to file his FTCA claim and this lawsuit does not prove that remedies were available

within the system. As the Second Circuit reasoned in *Hemphill*, "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance," but not an external one because the latter might avoid "threatened retaliatory conduct from prison employees." 380 F.3d at 688. The affidavits of the prison officials and Kaba's other grievances and filings merely turn this into a dispute with competing evidence, requiring a factfinder to evaluate the credibility of the witnesses and other evidence in the record.

We are left with a substantial number of open questions that cannot be resolved on the record before us: Could Kaba have obtained the necessary forms to file a grievance against these named prison officials? Could he have appealed to the Bureau of Prisons' Regional Director without the appropriate form? See 28 C.F.R. § 524.14(a), (d)(1). Would the Bureau of Prisons have permitted a tardy grievance after Kaba's transfer and is there any way that a prisoner would know whether the prison system considers such a situation "a valid reason for delay"? See 28 C.F.R. § 524.14(b). At what point did the prison officials' misconduct, if there was any, rise to the level so as to prevent a grievance from being filed? In light of these and other questions about the availability of the grievance system for Kaba, summary judgment is inappropriate at this point.

In addition to contending that the grievance system was unavailable to him, Kaba contends that the prison officials should be estopped from arguing that he failed to exhaust, because it was their misconduct and misstatements, like the comment that he could get grievance forms from the nonexistent paralegal, that impeded him. Because we have already decided that summary judgment was improper, we have no need to pursue this avenue further. We note, however, that while other circuits have found that equitable estoppel applies to the PLRA's exhaustion

requirement, see *Hemphill*, 380 F.3d at 688-89 (2d Cir.); *Wright v. Hollingsworth*, 260 F.3d 357, 358 n.2 (5th Cir. 2001), we have explicitly avoided deciding whether equitable estoppel applies in this context. See *Lewis v. Washington*, 300 F.3d 829, 834 (7th Cir. 2002). See also *Jernigan v. Stuchell*, 304 F.3d 1030, 1033 (10th Cir. 2002) (avoiding deciding whether equitable estoppel applies in this context). Here, again, we are satisfied that we may save this issue for another day.

Finally, Kaba challenges the district court's order dismissing his claim under the FTCA and refusing to permit him to amend his complaint a second time. We review a district court's denial of leave to amend a complaint for abuse of discretion. *Marshall v. Knight*, 445 F.3d 965, 968 (7th Cir. 2006). "A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served." FED. R. CIV. P. 15(a). Even after a responsive pleading has been served, a party may amend its pleading by leave of the court, "and leave shall be freely given when justice so requires." *Id.* "It is, by now, axiomatic that district courts have a special responsibility to construe *pro se* complaints liberally and to allow ample opportunity for amending the complaint when it appears that by so doing the *pro se* litigant would be able to state a meritorious claim." *Donald v. Cook County Sheriff's Dept.*, 95 F.3d 548, 555 (7th Cir. 1996).

Kaba contends that his "Motion Request for De Nov[o] Review and Propos[ed] Amend and Amendment and Rese[rv]ed His Objection" should have been construed (liberally) as a motion for leave to amend his claim. He points out that he filed the motion in direct response to a magistrate judge's order that stated, "If plaintiff wishes to assert a tort claim against the United States, he should file a motion seeking leave to file a Second Amended Complaint asserting a claim pursuant to the Federal Tort Claims Act and all other claims upon which he intends to

proceed." The magistrate had noted that although Kaba's First Amended Complaint attempted to raise a claim under the FTCA and to sue the prison administrators in their official capacity, it alleged only federal claims that were properly characterized as a *Bivens* action. A *Bivens* action may not be brought against the United States or a federal agency. It was for that reason that the magistrate judge recommended dismissing the official capacity claims. Kaba then filed his motion, but the district court found that it did not even mention the FTCA and therefore it could not be construed as a motion for leave to amend the complaint.

While it is true, as the Supreme Court held in *McNeil v. United States*, 508 U.S. 106, 113 (1993), that the Court has "never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel," the district court's approach here was too literal. The motion itself notes that it follows the magistrate judge's order and seeks to hold the Bureau of Prisons liable because it "failed to properly train[ ] [its] staffs which resulted in plaintiff injury and further failed to properly supervise their employees as a result plaintiff was assaulted" [sic]. Although the complaint does not include the word negligence, construed liberally the proposed amended complaint alleges negligent failure to train and supervise (a state law claim), and thus implicates the FTCA. See *Gil v. Reed*, 381 F.3d 649, 658 n.2 (7th Cir. 2004); *Hoskins*, 320 F.3d at 764. Nevertheless, Kaba faces a different problem that renders harmless any error the district court may have committed. As we noted earlier, he filed his FTCA administrative complaint on March 6, 2001, and he received his notice denying the claim on December 6, 2001. Long before the Bureau of Prisons acted on his claim—on March 12, 2001—he filed this lawsuit. *McNeil* holds that a lawsuit filed before the federal agency finally denies the claim is premature and must be dismissed. 508 U.S. at 113. It is thus not possible for Kaba to pursue his

FTCA claim: his March 12, 2001, lawsuit was too early, and any suit he might file now would be too late, as it would be long after the deadline of six months after the agency acts.

**IV**

The judgment of the district court is REVERSED and this case is REMANDED to the district court for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*