Justice Alito
delivered the opinion of the Court.
This case presents the question whether a prisoner can satisfy the Prison Litigation Reform Act’s exhaustion requirement, 42 U. S. C. § 1997e(a), by filing an untimely or otherwise procedurally defective administrative grievance or *84 appeal. We hold that proper exhaustion of administrative remedies is necessary.
I
A
Congress enacted the Prison Litigation Reform Act of 1995 (PLRA), 110 Stat. 1321-71, as amended, 42 U. S. C. § 1997e et seq., in 1996 in the wake of a sharp rise in prisoner litigation in the federal courts, see, e. g., Alexander v. Hawk, 159 F. 3d 1321, 1324-1325 (CA11 1998) (citing statistics). The PLRA contains a variety of provisions designed to bring this litigation under control. See, e. g., § 1997e(c) (requiring district courts to weed out prisoner claims that clearly lack merit); §1997e(e) (prohibiting claims for emotional injury without prior showing of physical injury); §1997e(d) (restricting attorney’s fees).
A centerpiece of the PLRA’s effort “to reduce the quantity ... of prisoner suits” is an “invigorated” exhaustion provision, § 1997e(a). Porter v. Nussle, 534 U. S. 516, 524 (2002). Before 1980, prisoners asserting constitutional claims had no obligation to exhaust administrative remedies. See Wilwording v. Swenson, 404 U. S. 249, 251 (1971) (per curiam). In the Civil Rights of Institutionalized Persons Act, § 7, 94 Stat. 352-353, Congress enacted a weak exhaustion provision, which authorized district courts to stay actions under Rev. Stat. § 1979, 42 U. S. C. § 1983, for a limited time while a prisoner exhausted “such plain, speedy, and effective administrative remedies as are available.” §1997e(a)(1) (1994 ed.). “Exhaustion under the 1980 prescription was in large part discretionary; it could be ordered only if the State’s prison grievance system met specified federal standards, and even then, only if, in the particular case, the court believed the requirement ‘appropriate and in the interests of justice.’” Nussle, supra, at 523 (quoting § 1997e). In addition, this provision did not require exhaustion if the prisoner sought only money damages and such *85 relief was not available under the relevant administrative scheme. See McCarthy v. Madigan, 503 U. S. 140, 150-151 (1992).
The PLRA strengthened this exhaustion provision in several ways. Exhaustion is no longer left to the discretion of the district court, but is mandatory. See Booth v. Churner, 532 U. S. 731, 739 (2001). Prisoners must now exhaust all “available” remedies, not just those that meet federal standards. Indeed, as we held in Booth, a prisoner must now exhaust administrative remedies even where the relief sought—monetary damages—cannot be granted by the administrative process. Id., at 734. Finally, exhaustion of available administrative remedies is required for any suit challenging prison conditions, not just for suits under § 1983. Nussle, supra, at 524.
B
California has a grievance system for prisoners who seek to challenge their conditions of confinement. To initiate the process, an inmate must fill out a simple form, Dept, of Corrections, Inmate/Parolee Appeal Form, CDC 602 (12/87) (hereinafter Form 602), that is made “readily available to all inmates.” Cal. Code Regs., tit. 15, § 3084.1(c) (2004). The inmate must fill out two parts of the form: part A, which is labeled “Describe Problem,” and part B, which is labeled “Action Requested.” Then, as explained on Form 602 itself, the prisoner “must first informally seek relief through discussion with the appropriate staff member.” App. 40-41. The staff member fills in part C of Form 602 under the heading “Staff Response” and then returns the form to the inmate.
If the prisoner is dissatisfied with the result of the informal review, or if informal review is waived by the State, the inmate may pursue a three-step review process. See §§3084.5(b)-(d). Although California labels this “formal” review (apparently to distinguish this process from the prior step), the three-step process is relatively simple. At the first level, the prisoner must fill in part D of Form 602, which *86 states: “If you are dissatisfied, explain below.” Id., at 40. The inmate then must submit the form, together with a few other documents, to the appeals coordinator within 15 working days—three weeks—of the action taken. § 3084.6(c). This level may be bypassed by the appeals coordinator in certain circumstances. § 3084.5(b). Within 15 working days after an inmate submits an appeal, the reviewer must inform the inmate of the outcome by completing part E of Form 602 and returning the form to the inmate.
If the prisoner receives an adverse determination at this first level, or if this level is bypassed, the inmate may proceed to the second level of review conducted by the warden. §§ 3084.5(c), (e)(1). The inmate does this by filling in part F of Form 602 and submitting the form within 15 working days of the prior decision. Within 10 working days thereafter, the reviewer provides a decision on a letter that is attached to the form. If the prisoner’s claim is again denied or the prisoner otherwise is dissatisfied with the result, the prisoner must explain the basis for his or her dissatisfaction on part H of the form and mail the form to the Director of the California Department of Corrections and Rehabilitation within 15 working days. § 3084.5(e)(2). An inmate’s appeal may be rejected where “[t]ime limits for submitting the appeal are exceeded and the appellant had the opportunity to file within the prescribed time constraints.” § 3084.3(c)(6).
C
, Respondent is a prisoner who was convicted for murder and is serving a life sentence in the California prison system. In October 2000, respondent was placed in administrative segregation for allegedly engaging in “inappropriate activity” in the prison chapel. Two months later, respondent was returned to the general population, but respondent claims that he was prohibited from participating in “special programs,” including a variety of religious activities. *87 Approximately six months after that restriction was imposed, respondent filed a grievance with prison officials challenging that action. That grievance was rejected as untimely because it was not filed within 15 working days of the action being challenged. See §§ 3084.3(c)(6), 3084.6(c).
Respondent appealed that decision internally without success, and subsequently sued petitioners—California correctional officials—under 42 U. S. C. § 1983 in Federal District Court. The District Court granted petitioners’ motion to dismiss because respondent had not fully exhausted his administrative remedies as required by § 1997e(a). See App. to Pet. for Cert. 24-25.
The Court of Appeals for the Ninth Circuit reversed and held that respondent had exhausted administrative remedies simply because no such remedies remained available to him. 403 F. 3d 620, 629-630 (2005). The Ninth Circuit’s decision, while consistent with the decision of a divided panel of the Sixth Circuit in Thomas v. Woolum, 337 F. 3d 720 (2003), conflicts with decisions of four other Courts of Appeals. See Pozo v. McCaughtry, 286 F. 3d 1022, 1025 (CA7) (“To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison’s administrative rules require”), cert. denied, 537 U. S. 949 (2002); Ross v. County of Bernalillo, 365 F. 3d 1181, 1185-1186 (CA10 2004) (same); Spruill v. Gillis, 372 F. 3d 218, 230 (CA3 2004) (same); Johnson v. Meadows, 418 F. 3d 1152, 1159 (CA11 2005) (same). We granted certiorari to address this conflict, 546 U. S. 1015 (2005), and we now reverse.
II
A
The PLRA provides as follows:
“No action shall be brought with respect to prison conditions under section 1983 of this title, or any other *88 Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.” §1997e(a) (2000 ed.) (emphasis added).
There is no dispute that this language requires a prisoner to “exhaust” administrative remedies, but the parties differ sharply in their understanding of the meaning of this requirement. Petitioners argue that this provision requires proper exhaustion. This means, according to petitioners, that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court. Respondent, on the other hand, argues that this provision demands what he terms “exhaustion simpliciter” Brief for Respondent 7. In his view, §1997e(a) simply means that a prisoner may not bring suit in federal court until administrative remedies are no longer available. Under this interpretation, the reason why administrative remedies are no longer available is irrelevant. Bare unavailability suffices even if this results from a prisoner’s deliberate strategy of refraining from filing a timely grievance so that the litigation of the prisoner’s claim can begin in federal court.
The key for determining which of these interpretations of §1997e(a) is correct lies in the term of art “exhausted.” Exhaustion is an important doctrine in both administrative and habeas law, and we therefore look to those bodies of law for guidance.
B
“The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law.” McKart v. United States, 395 U. S. 185, 193 (1969). “The doctrine provides 'that no one is entitled to judicial relief *89 for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.’” Ibid, (quoting Myers v. Bethlehem Shipbuilding Corp., 303 U. S. 41, 50-51 (1938)). Exhaustion of administrative remedies serves two main purposes. See McCarthy, 503 U. S., at 145.
First, exhaustion protects “administrative agency authority.” Ibid. Exhaustion gives an agency “an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court,” and it discourages “disregard of [the agency’s] procedures.” Ibid.
Second, exhaustion promotes efficiency. Ibid. Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court. In some cases, claims are settled at the administrative level, and in others, the proceedings before the agency convince the losing party not to pursue the matter in federal court. See ibid.; Parisi v. Davidson, 405 U. S. 34, 37 (1972); McKart, supra, at 195. “And even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration.” McCarthy, supra, at 145.
Because of the advantages of administrative review, some aggrieved parties will voluntarily exhaust all avenues of administrative review before resorting to federal court, and for these parties an exhaustion requirement is obviously unnecessary. • Statutes requiring exhaustion serve a purpose when a significant number of aggrieved parties, if given the choice, would not voluntarily exhaust. Aggrieved parties may prefer not to exhaust administrative remedies for a variety of reasons. Although exhaustion promotes overall efficiency, a party may conclude—correctly or incorrectly— that exhaustion is not efficient in that party’s particular case. In addition, some aggrieved parties may prefer to proceed *90 directly to federal court for other reasons, including bad faith.[1] See Thomas, 337 F. 3d, at 752-753 (Rosen, J., dissenting in part and concurring in judgment).
Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which “means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).” Pozo, 286 F. 3d, at 1024 (emphasis in original). This Court has described the doctrine as follows: “[A]s a general rule ... courts should not topple over administrative decisions unless the administrative body not only has erred, but has erred against objection made at the time appropriate under its practice.” United States v. L. A. Tucker Truck Lines, Inc., 344 U. S. 33, 37 (1952) (emphasis added). See also Sims v. Apfel, 530 U. S. 103, 108 (2000); id., at 112 (O’Connor, J., concurring in part and concurring in judgment) (“On this underlying principle of administrative law, the Court is unanimous”); id., at 114-115 (Breyer, J., dissenting); Unemployment Compensation Comm’n of Alaska v. Aragon, 329 U. S. 143, 155 (1946); Hormel v. Helvering, 312 U. S. 552, 556-557 (1941); 2 K. Davis & R. Pierce, Administrative Law Treatise § 15:8, pp. 341-344 (3d ed. 1994). Proper exhaustion demands compliance with an agency’s deadlines and other critical procedural rules because no adjudicative system can function effectively with *91 out imposing some orderly structure on the course of its proceedings.[2]
*92 c
The law of habeas corpus has rules that are substantively similar to those described above. The habeas statute generally requires a state prisoner to exhaust state remedies before filing a habeas petition in federal court. See 28 U. S. C. §§ 2254(b)(1), (c). “This rule of comity reduces friction between the state and federal court systems by avoiding the ‘unseemliness]’ of a federal district court’s overturning a state-court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance.” O’Sullivan v. Boerckel, 526 U. S. 838, 845 (1999) (alteration in original). A state prisoner is generally barred from obtaining federal habeas relief unless the prisoner has properly presented his or her claims through one “complete round of the State’s established appellate review process.” Ibid. In practical terms, the law of habeas, like administrative law, requires proper exhaustion, and we have described this feature of habeas law as follows: “To ... ‘protect the integrity’ of the federal exhaustion rule, we ask not only whether a prisoner has exhausted his state remedies, but also whether he has properly exhausted those remedies . . . .” Id., at 848 (citation omitted; emphasis in original).
The law of habeas, however, uses terminology that differs from that of administrative law. In habeas, the sanction for failing to exhaust properly (preclusion of review in federal court) is given the separate name of procedural default, although the habeas doctrines of exhaustion and procedural default “are similar in purpose and design and implicate similar concerns,” Keeney v. Tamayo-Reyes, 504 U. S. 1, 7 (1992). See also Coleman v. Thompson, 501 U. S. 722, 731-732 (1991). In habeas, state-court remedies are described as having been “exhausted” when they are no longer available, regardless of *93 the reason for their unavailability. See Gray v. Netherland, 518 U. S. 152, 161 (1996). Thus, if state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, ibid., but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding. Id., at 162; Coleman, supra, at 744-751.
Ill
With this background in mind, we are persuaded that the PLRA exhaustion requirement requires proper exhaustion.
A
The text of 42 U. S. C. § 1997e(a) strongly suggests that the PLRA uses the term “exhausted” to mean what the term means in administrative law, where exhaustion means proper exhaustion. Section 1997e(a) refers to “such administrative remedies as are available,” and thus points to the doctrine of exhaustion in administrative law.
B
Construing §1997e(a) to require proper exhaustion also fits with the general scheme of the PLRA, whereas respondent’s interpretation would turn that provision into a largely useless appendage. The PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons,[3] and thus seeks to “affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.” Nussle, 534 U. S., at 525. See also Booth, 532 U. S., at 739. The PLRA also *94 was intended to “reduce the quantity and improve the quality of prisoner suits.” Nussle, supra, at 524.
Requiring proper exhaustion serves all of these goals. It gives prisoners an effective incentive to make full use of the prison grievance process and accordingly provides prisons with a fair opportunity to correct their own errors. This is particularly important in relation to state corrections systems because it is “difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.” Preiser v. Rodriguez, 411 U. S. 475, 491-492 (1973).
Proper exhaustion reduces the quantity of prisoner suits because some prisoners are successful in the administrative process, and others are persuaded by the proceedings not to file an action in federal court.[4] Finally, proper exhaustion *95 improves the quality of those prisoner suits that are eventually filed because proper exhaustion often results in the creation of an administrative record that is helpful to the court. When a grievance is filed shortly after the event giving rise to the grievance, witnesses can be identified and questioned while memories are still fresh, and evidence can be gathered and preserved.
While requiring proper exhaustion serves the purposes of the PLRA, respondent’s interpretation of §1997e(a) would make the PLRA exhaustion scheme wholly ineffective. The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system’s critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system’s procedural rules unless noncompliance carries a sanction, and under respondent’s interpretation of the PLRA noncompliance carries no significant sanction. For example, a prisoner wishing to bypass available administrative remedies could simply file a late grievance without providing any reason for failing to file on time. If the prison then rejects the grievance as untimely, the prisoner could proceed directly to federal court. And acceptance of the late grievance would not thwart the prisoner’s wish to bypass the administrative process; the prisoner could easily achieve this by violating other procedural rules until the prison administration has no alternative but to dismiss the grievance on procedural grounds. We are confident that the PLRA did not create such a toothless scheme.
Respondent argues that his interpretation of the PLRA’s exhaustion provision would filter out frivolous claims because, by the time the deadline for filing a grievance has passed, the inmate may no longer wish to file suit. Brief for Respondent 43. But since the deadline for filing an administrative grievance is generally not very long—14 to 30 days *96 according to the United States, see Brief for United States as Amicus Curiae 29, and even less according to respondent, see Brief for Respondent 30, n. 17—it is doubtful that Congress thought requiring a prisoner to wait this long would provide much of a deterrent. Indeed, many prisoners would probably find it difficult to prepare, file, and serve a civil complaint before the expiration of the deadline for filing a grievance in many correctional systems.
Respondent also contends that his interpretation of the PLRA exhaustion requirement would filter out frivolous claims because prisoners could not simply wait until the deadline for filing an administrative grievance had passed. According to respondent, “most grievance systems give administrators the discretion to hear untimely grievances,” and therefore a prisoner “will be required to file an untimely grievance, and thereby give the grievance system” the opportunity to address the complaint. Id., at 43. But assuming for the sake of argument that the premise of this argument is correct, i. e., that a court could never conclude that administrative remedies were unavailable unless an administrative decision had so held, but see Coleman, 501 U. S., at 735, n., a prisoner who does not want to participate in the prison grievance process would have little difficulty in forcing the prison to dismiss his administrative case on procedural grounds. Under the California system, for example, a prisoner has numerous opportunities to miss deadlines. Therefore, the task of engineering such a dismissal of a grievance on procedural grounds is unlikely to be sufficient to alter the conduct of a prisoner whose objective is to bypass the administrative process.
C
Finally, as interpreted by respondent, the PLRA exhaustion requirement would be unprecedented. Respondent has not pointed to any statute or case that purports to require *97 exhaustion while at the same time allowing a party to bypass deliberately the administrative process by flouting the agency’s procedural rules. It is most unlikely that the PLRA, which was intended to deal with what was perceived as a disruptive tide of frivolous prisoner litigation, adopted an exhaustion requirement that goes further than any other model that has been called to our attention in permitting the wholesale bypassing of administrative remedies. Respondent identifies three models for the scheme of “exhaustion simpliciter” that he believes is set out in the PLRA, but none of these examples is apt.
Respondent first looks to habeas law as it existed prior to Wainwright v. Sykes, 433 U. S. 72 (1977). Before then, a federal habeas claim could be procedurally defaulted only if the prisoner deliberately bypassed state remedies. See Fay v. Noia, 372 U. S. 391, 438 (1963). It would be fanciful, however, to suggest that the PLRA exhaustion requirement was patterned on habeas law as it existed in the years between Fay and Wainwright. As respondent stresses, the PLRA was enacted contemporaneously with the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, which gave federal habeas review a structure markedly different from that which existed in the period between Fay and Wainwright.
Furthermore, respondent’s interpretation of §1997e(a) would not duplicate the scheme that existed in habeas during that interval. As interpreted by respondent, §1997e(a) would permit a prisoner to bypass deliberately and flagrantly administrative review without any risk of sanction. Because it is unlikely that the PLRA was intended to permit this, the two Courts of Appeals that have held that § 1997e(a) does not require proper exhaustion both pointedly stated that their decisions did not allow a prisoner to bypass deliberately administrative remedies. See 403 F. 3d, at 629; Thomas, 337 F. 3d, at 732, and n. 4. Neither of these courts, *98 however, explained how § 1997e(a) can be interpreted in this way—that is, so that it does not require proper exhaustion but somehow proscribes deliberate bypass.
Apparently recognizing that such an interpretation neither has a statutory basis nor refers to a concept of exhaustion from an existing body of law, respondent does not contend that § 1997e(a) prohibits deliberate bypass; in his view, all that § 1997e(a) demands is that a prisoner wait until any opportunity for administrative review has evaporated. But in making this argument, respondent asks us to hold that the PLRA was meant to adopt an exhaustion scheme that stands in sharp contrast to both current and past habeas law and is unlike any other exhaustion scheme that has been called to our attention.
Respondent next suggests that the PLRA exhaustion requirement was patterned on § 14(b) of the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 607, codified at 29 U. S. C. § 633(b), and § 706(e) of Title VII of the Civil Rights Act of 1964, 78 Stat. 260, as redesignated and amended, 42 U. S. C. § 2000e-5(e), but these are implausible models. Neither of these provisions makes reference to the concept of exhaustion, and neither is in any sense an exhaustion provision.
In Oscar Mayer & Co. v. Evans, 441 U. S. 750 (1979), we considered § 14(b) of the ADEA, which provides that, if a State has an agency to redress state-law age-related employment-discrimination claims, an ADEA claim may not be brought in federal court “before the expiration of sixty days after proceedings have been commenced under the State law.” 29 U. S. C. § 633(b) (emphasis added). This provision makes no reference to the exhaustion of state remedies, only to the “commence[ment]” of state proceedings, and this provision leaves no doubt that proper commencement of those proceedings is not required. As we noted, see Oscar Mayer, 441 U. S., at 759, § 14(b) of the ADEA states that the requirement of commencement is satisfied merely by sending *99 the state agency a signed statement of the pertinent facts, and § 14(b) explicitly provides that the commencement requirement does not entail compliance with any other state procedural rule, including a deadline for initiating the state proceeding, id., at 760. We see little similarity between § 14(b), which merely requires the commencement of state proceedings and explicitly does not require timely commencement, and 42 U. S. C. § 1997e(a), which expressly requires exhaustion of available administrative remedies with no reference to a federally based limiting principle.
Section 706(e) of Title VII is also fundamentally different from the PLRA exhaustion provision. As interpreted by this Court, § 706(e) means that a complainant who “initially institutes proceedings with a state or local agency with authority to grant or seek relief from the practice charged” must “file a charge” with that agency, or “have the EEOC refer the charge to that agency, within 240 days of the alleged discriminatory event . . . .” EEOC v. Commercial Office Products Co., 486 U. S. 107, 110-111 (1988). Following the reasoning of Oscar Mayer, we held that this filing requirement did not demand that the charge submitted to the state or local authority be filed in compliance with the authority’s time limit. 486 U. S., at 123-125. Because § 706(e) of Title VII refers only to the filing of a charge with a state or local agency and not to the exhaustion of remedies, § 706(e) cannot be viewed as a model for the PLRA exhaustion provision.
IV
Respondent’s remaining arguments regarding the interpretation of 42 U. S. C. § 1997e(a) are unconvincing. Relying on the use of the term “until” in the phrase “until such administrative remedies as are available are exhausted,” respondent contends that “[t]he use of the temporal word ‘until’ . .. conveys a timing requirement: it assumes that the question to be answered is simply whether the prisoner can file suit now or must wait until later.” Brief for Respondent 11. *100 Likewise, according to respondent, the use of the present tense (“such administrative remedies as are available,” §1997e(a) (emphasis added)) requires “a focus on whether any administrative remedies are presently available.” Id., at 12. But saying that a party may not sue in federal court until the party first pursues all available avenues of administrative review necessarily means that, if the party never pursues all available avenues of administrative review, the person will never be able to sue in federal court. Thus, § 1997e(a)’s use of the term “until” and the present tense does not support respondent’s position.
Respondent attaches significance to the fact that the PLRA exhaustion provision does not expressly state that a prisoner must have “properly exhausted” available administrative remedies, whereas a tolling provision of the AEDPA provides that the time for filing a federal habeas petition is tolled during the period when “a properly filed application for State post-conviction or other collateral review ... is pending.” 28 U. S. C. § 2244(d)(2) (emphasis added). In our view, respondent draws an unreasonable inference from the difference in the wording of these two provisions. Although the AEDPA and the PLRA were enacted at roughly the same time, they are separate and detailed pieces of legislation. Moreover, the AEDPA and PLRA provisions deal with separate issues: tolling in the case of the AEDPA and exhaustion in the case of the PLRA.
Respondent maintains that his interpretation of the PLRA exhaustion provision is bolstered by another PLRA provision, 42 U. S. C. § 1997e(c)(2), that permits a district court to dismiss certain prisoner claims “without first requiring the exhaustion of administrative remedies.” According to respondent, this provision shows that Congress thought that, at the point when a district court might make such a ruling (which would typically be well after the filing of the complaint), a prisoner might still have the opportunity to exhaust administrative remedies. Because short administrative fil *101 ing deadlines would make this impossible, respondent contends, Congress cannot have thought that a prisoner’s failure to comply with those deadlines would preclude litigation in federal court.
Respondent’s argument is unconvincing for at least two reasons. First, respondent has not shown that Congress had reason to believe that every prison system would have relatively short and categorical filing deadlines. Indeed, respondent asserts that most grievance systems give administrators the discretion to hear untimely grievances. Second, even if dismissals under § 1997e(c)(2) typically occur when the opportunity to pursue administrative remedies has passed, § 1997e(c)(2) still serves a useful function by making it clear that the PLRA exhaustion requirement is not jurisdictional, and thus allowing a district court to dismiss plainly meritless claims without first addressing what may be a much more complex question, namely, whether the prisoner did in fact properly exhaust available administrative remedies.[5]
Respondent next argues that the similarity between the wording of the PLRA exhaustion provision and the AEDPA exhaustion provision, 28 U. S. C. § 2254(c), shows that the PLRA provision was meant to incorporate the narrow technical definition of exhaustion that applies in habeas. We reject this argument for two reasons.
First, there is nothing particularly distinctive about the wording of the habeas and PLRA exhaustion provisions. They say what any exhaustion provision must say—that a judicial remedy may not be sought or obtained unless, until, *102 or before certain other remedies are exhausted. It is, therefore, unrealistic to infer from the wording of the PLRA provision that Congress framed and adopted that provision with habeas law and not administrative law in mind. Indeed, the wording of the PLRA provision (a prisoner may not bring an action with respect to prison conditions “until such administrative remedies as are available are exhausted”) is strikingly similar to our description of the doctrine of administrative exhaustion (“ ‘no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted,’ ” McKart, 395 U. S., at 193 (emphasis added)).
Second, respondent’s suggestion that the PLRA was meant to incorporate the same technical distinction that exists in habeas law without providing any sanction to prevent willful noncompliance—not even the deliberate bypass standard of Fay—would produce a scheme that in practical terms is radically different from the habeas scheme. Copying habeas’ narrow definition of exhaustion without furnishing any sanction to promote compliance would be like copying the design for an airplane but omitting one of the wings.
Respondent contends that requiring proper exhaustion will lead prison administrators to devise procedural requirements that are designed to trap unwary prisoners and thus to defeat their claims. Respondent does not contend, however, that anything like this occurred in his case, and it is speculative that this will occur in the future. Corrections officials concerned about maintaining order in their institutions have a reason for creating and retaining grievance systems that provide—and that are perceived by prisoners as providing—a meaningful opportunity for prisoners to raise meritorious grievances. And with respect to the possibility that prisons might create procedural requirements for the purpose of tripping up all but the most skillful prisoners, while Congress repealed the “plain, speedy, and effective” standard, see 42 U. S. C. § 1997e(a)(1) (1994 ed.) (repealed *103 1996), we have no occasion here to decide how such situations might be addressed.
Respondent argues that requiring proper exhaustion is harsh for prisoners, who generally are untrained in the law and are often poorly educated. This argument overlooks the informality and relative simplicity of prison grievance systems like California’s, as well as the fact that prisoners who litigate in federal court generally proceed pro se and are forced to comply with numerous unforgiving deadlines and other procedural requirements.
* * *
For these reasons, we reverse the judgment of the Court of Appeals for the Ninth Circuit and remand the case for proceedings consistent with this opinion.

It is so ordered.

 One can conceive of an inmate’s seeking to avoid creating an administrative record with someone that he or she views as a hostile factfinder, filing a lawsuit primarily as a method of making some corrections official’s life difficult, or perhaps even speculating that a suit will mean a welcome— if temporary—respite from his or her cell.

 The dissent makes two chief arguments regarding the doctrine of exhaustion in administrative law. Neither is sound.
First, the dissent contends that, “in the absence of explicit statutory directive,” proper exhaustion is required only in proceedings that are in the nature of “appellate review proceedings.” Post, at 112 (opinion of Stevens, J.). The only authorities cited in support of this proposition are Sims v. Apfel, 530 U. S. 103, 108-109 (2000)—which concerns different questions, i. e., issue exhaustion and the distinction between adversarial and nonadversarial proceedings—and an amici brief, which in turns cites no supporting authority. See post, at 112 (citing Brief for Law Professors 1). The amici brief argues that “[t]he conceptual key to this case is [the] distinction” between an “original proceeding,” in which “the court is simply determining the legality of out-of-court action,” and a “review proceeding,” in which the court must “review the decision of some other adjudicator.” Id., at 2-3. According to the amici brief, habeas petitions are prime examples of “review proeeeding[s]” because they “ask federal courts to review the decisions of state courts.” Id, at 3. This argument is deeply flawed.
“[ H]abeas corpus [is] an original . . . civil remedy for the enforcement of the right to personal liberty, rather than... a stage of the state criminal proceedings ... or as an appeal therefrom.” Fay v. Noia, 372 U. S. 391, 423-424 (1963) (footnote omitted). And habeas law includes the “judge-made doctrine of procedural default.” Post, at 108, n. 5. This shows that the dissent and the amici brief are incorrect in contending that a proper exhaustion requirement is incompatible with an original proceeding.
Second, the dissent argues that, even if administrative law generally requires proper exhaustion, respondent falls within an exception to that rule. Post, at 114. As the dissent puts it, “[bjecause respondent has raised constitutional claims,... the Court may not, as a matter of federal common law, apply an extras.tatutory waiver requirement against him.” Ibid. But we are not applying an “extrastatutory” requirement “as a matter of federal common law.” Ibid. We are interpreting and applying the statutory requirement set out in the PLRA exhaustion provision. We interpret the PLRA exhaustion provision to require proper exhaustion, not the unprecedented scheme of exhaustion simpliciter that respondent advocates. As for the suggestion that the PLRA might be meant to require proper exhaustion of nonconstitutional claims but not constitutional claims, we fail to see how such a carve-out would serve Congress’ purpose of addressing a flood of prisoner litigation in the federal courts, see supra, *92 at 84, when the overwhelming majority of prisoner civil rights and prison condition suits are based on the Constitution.

 See, e. g., 18 U. S. C. § 3626(b)(2) (termination of prison conditions consent decrees).

 The dissent’s objection, post, at 115-116, that exhaustion simpliciter is enough to reduce frivolous prisoner suits is not well taken. First, what matters is not whether proper exhaustion was necessary to reach that goal, but whether proper exhaustion was mandated by Congress. Second, the empirical support for the dissent’s conclusion is weak. The dissent points to a drop in volume of prisoner litigation between 1995 and 2000 and concludes that exhaustion simpliciter “was sufficient to reduce the quantity of prisoner suits without any procedural default requirement.” Post, at 116. But this mistakes correlation for causation: A requirement of exhaustion simpliciter will not, absent a mollified prisoner, prevent a case from being docketed—and thus appearing in the filing statistics the dissent cites. The credit for reduced filings more likely belongs to the PLRA’s enactment of 28 U. S. C. § 1915A (requiring district courts to screen “before docketing, if feasible,” prisoner civil complaints), and its amendments to § 1915 (forbidding frequent-filer prisoners from proceeding in forma pauperis). Finally, prisoner civil rights and prison conditions eases still account for an outsized share of filings: From 2000 through 2005, such cases represented between 8.3% and 9.8% of the new filings in the federal district courts, or on average about one new prisoner case every other week for each of the nearly 1,000 active and senior district judges across the country. See Administrative Office of the United States Courts, Judicial Facts and Figures, tbls. 1.1, 4.4, 4.6, http://www.uscourts. gov/judicialfactsfigures/contents.html (as visited June 19, 2006, and available in Clerk of Court’s case file).

 Questions regarding the timeliness of prisoner filings occur frequently. See, e. g., Wallace v. Burbury, 305 F. Supp. 2d 801, 806 (ND Ohio 2003); Pusey v. Belanger, No. Civ.02-351-SLR, 2004 WL 2075472 (D. Del., Sept. 14, 2004); Eakle v. Tennis, No. Civ. 4:CV-04-2040, 2005 WL 2266270 (MD Pa., Sept. 16, 2005); Williams v. Briley, No. 04 C 5701, 2005 WL 1498865 (ND Ill., June 21, 2005); Isaac v. Nix, No. Civ.A.2:04CV172RWS, 2006 WL 861642 (ND Ga., Mar. 30, 2006).