07-0612-pr
Espinal v. Goord

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Submitted: December 4, 2008

Decided: February 2, 2009
Amended: February 27, 2009)

Docket No. 07-0612-pr

_____

CESAR A. ESPINAL,

Plaintiff-Appellant,

v.

COMMISSIONER GLENN S. GOORD, BRIAN F. MALONE, Inspector General of the New York State Department of Correctional Services, CHRISTOPHER P. ARTUZ, Former Superintendent of Green Haven Correctional Facility, W. TOTTEN, Captain of Green Haven Correctional Facility, COLEMAN S. WILSON, Correctional Sergeants of Green Haven Correctional Facility, KENNETH G. HAFFORD, Correctional Sergeants of Green Haven Correctional Facility, JERRY W. SURBER, Correctional Officer of Green Haven Correctional Facility, FRASHER, Correctional Officer of Green Haven Correctional Facility, ROSARIO, Correctional Officer of Green Haven Correctional Facility, AYOTLE, Correctional Officer of Green Haven Correctional Facility, DANIEL F. MARTUCELLO, Correctional Officer of Green Haven Correctional Facility, B. RODAS, Correctional Medical Providers of Green Haven Correctional Facility, B. HEALY, Correctional Medical Providers of Green Haven Correctional Facility, CHAKRAVARTY, Correctional Medical Providers of Green Haven Correctional Facility, JOHN DOE 1-2, in their personal and individual capacity,

Defendants-Appellees.

_____

Before: LEVAL, POOLER, and PARKER, Circuit Judges.

_____

1

Cesar Espinal, an inmate of the New York State Department of Correctional Services ("DOCS") who filed an action under 42 U.S.C. § 1983, appeals the order of the United States District Court for the Southern District of New York (George A. Yanthis, M.J.) granting summary judgment, in part, on the ground that Espinal failed to exhaust administrative remedies under the Prison Litigation Reform Act of 1995 ("PLRA"). After the district court issued its order, the U.S. Supreme Court held in Jones v. Bock that exhaustion under the PLRA does not require a prisoner's grievance to identify the parties responsible for misconduct unless an identification requirement is provided in the state's grievance procedures. 549 U.S. 199, 218 (2007). The New York DOCS' grievance procedures do not require an inmate to specifically name responsible parties. Accordingly, Espinal did not fail to exhaust his administrative remedies by omitting the names of defendants from his prison grievance. We therefore REVERSE the grant of summary judgment on this ground. We also REVERSE the dismissal of Espinal's retaliation claims, and AFFIRM the denial of Espinal's motion for a new trial.

AFFIRMED in part, REVERSED and REMANDED in part.

_____

> CESAR A. ESPINAL, pro se, for Plaintiff-Appellant,
>
> MARION R. BUCHBINDER, Assistant Solicitor General, (BARBARA D. UNDERWOOD, Solicitor General, BENJAMIN N. GUTMAN, Deputy Solicitor General, Assistant Solicitor General, on the brief), for ANDREW M. CUOMO, Attorney General of the State of New York, New York, NY, for Defendants-Appellees.

_____

2

POOLER, Circuit Judge:

Cesar A. Espinal, an inmate of the New York State Department of Correctional Services ("DOCS"), filed a lawsuit, under 42 U.S.C. § 1983, in the United States District Court for the Southern District of New York, alleging, inter alia, that the defendants used excessive force against him and denied him medical treatment in violation of the Eighth Amendment, that they did so in retaliation for Espinal's prior lawsuits, and that they conspired to assault him and deny him medical care in violation of his constitutional rights. The district court (George A. Yanthis, M.J.) issued an order, entered on September 1, 2005, that granted in part and denied in part the defendants' motion for summary judgment.[1] The district court dismissed all claims against twelve of the fourteen defendants on the ground that Espinal failed to exhaust administrative remedies, under the Prison Litigation Reform Act of 1995, by failing to name those defendants in his grievance. The district court granted summary judgment, in part, in favor of the two remaining defendants, Surber and Frasher, because Espinal failed to exhaust his administrative remedies on the conspiracy claims and because there were no triable issues of material fact on the retaliation claims. The district court denied summary judgment as to Espinal's excessive force claims against Surber and Frasher. A jury returned a verdict in favor of Surber and Frasher on the excessive force claims. Espinal appealed the order granting summary judgment in part and an order, made by oral decision and entered on January 11, 2007, that denied his motion for a new trial.

After the district court's order granting summary judgment in part, the U.S. Supreme

---

[1] The parties consented to have a magistrate judge conduct all proceedings pursuant to 28 U.S.C. § 636(c).

Court held in Jones v. Bock that exhaustion under the Prison Litigation Reform Act does not require a prisoner's grievance to identify the parties responsible for misconduct unless an identification requirement is provided in the state's grievance procedures. 549 U.S. 199, 218 (2007). Because the New York DOCS grievance procedures do not require an inmate to specifically name responsible parties, Espinal did not fail to exhaust his administrative remedies by omitting the names of the defendants from his prison grievance. We therefore reverse the grant of summary judgment on this ground. We also reverse the grant of summary judgment in favor of Surber and Frasher on the conspiracy claims and the retaliation claims. We affirm the district court's denial of Espinal's motion for a new trial, and deny Espinal's request for a temporary restraining order.[2]

## BACKGROUND

Espinal makes the following allegations in his Section 1983 complaint. On the morning of December 17, 1999, Espinal "got into a dispute" with another inmate, but was not harmed. He was then taken to the medical clinic for a "fight exam." Officer Williams, who is not a defendant in this action, escorted Espinal to the clinic. Espinal was allegedly confronted by Sergeant Wilson, corrections officers Surber, Rosario, Frasher, Ayotle, and several additional officers, who brought him into the "sick-call room" of the clinic. Surber, Ayotle, and Frasher repeatedly slammed Espinal into the wall. The officers asked Espinal whether he had been in a fight. Before Espinal answered, Rosario "told him to shut-up," and Surber struck him on the side of his head. The officers then informed Espinal that they would hit him if he did not answer their

---

[2] After due consideration of the State's petition for rehearing, which was denied, we have amended our opinion.

questions in the affirmative. Surber and Rosario allegedly punched Espinal several times on the side of the head when he did not respond to their questions.

When Officer Williams returned to ask whether Espinal was ready to be brought into the clinic, the defendants informed Williams that they were "not finished with Espinal." The officers continued to hit Espinal and kicked him in his right leg where he was previously injured by a gun shot. Espinal was taken into the clinic at approximately 9:10 a.m. after a half-hour beating, and was warned not to tell anyone what happened. Espinal had previously filed a lawsuit against several DOCS defendants, including Surber, in June 1998. Espinal alleges that he was told by the officers during the December 17, 1999 incident that "this is what happens to [i]nmates when they submit law suits against us," and that they threatened to kill him.

At the clinic, Espinal was first seen by Nurse Healy. Espinal informed Healy that the officers caused his injuries, but Healy was told by Surber that the injuries resulted from the fight with the other inmate. Espinal was then seen by a doctor, defendant Dr. Chakravarty, who tried to examine Espinal, but Espinal refused treatment because Chakravarty's method of examination was causing him pain. Espinal would not sign a refusal-of-treatment form and asked to be seen by another doctor. Chakravarty denied the request. Espinal then asked Sergeant Hafford if he could be seen by another doctor and be taken to the mental health unit. Hafford denied these requests because Espinal's medical charts showed that he had refused medical treatment and did not indicate any mental health problems.

Espinal was then left in a room with Surber and Ayotle who verbally harassed him. Specifically, Surber threatened to kill Espinal if Espinal did not attempt suicide. Espinal was taken back to his cell at around 10:30 a.m. Espinal asked to go to emergency sick call several

5

times, but defendant Martucello denied his requests. Later that day, around 6:20 p.m., Espinal was again brought to the clinic and was reevaluated. An inmate injury report was prepared that listed injuries to Espinal's head, right leg, and wrists. Subsequently, Espinal had several appointments to be seen by the medical department during December 1999, January 2000, and February 2000. Espinal alleges that the officers and defendant Rodas did not permit him to attend those appointments.

The defendants denied Espinal's allegations in their answer, and asserted failure to exhaust administrative remedies as an affirmative defense. The record contains two internal grievances filed by Espinal that are pertinent to this lawsuit. In the first grievance, filed on December 17, 1999, Espinal claimed that, on that morning, in the "sick call room," he was "handcuffed and beaten severe[ly] to the head, face, and body, by officer Surber, officer Frash[e]r and other countless security officers, as they [were] slurring racial comments and threats of killing me," and that the beating was "retaliation" against him. On February 3, 2000, defendant Christopher Artuz, then-Superintendent of Green Haven Correctional Facility, denied the grievance, finding Espinal "was not refused medical attention, rather, [Espinal himself] refused medical assistance," and there was "no evidence to substantiate [Espinal's] allegations of unprofessional conduct and threats." On February 11, 2000, Espinal appealed, and on April 5, 2000, his appeal was denied.

In the second grievance, dated January 19, 2000, Espinal stated that he was making a complaint "against Green Haven's Medical Dept." for deliberate indifference to his serious medical needs in connection with various "[m]andatory [c]linic [a]ppointments," and asserted that "the conduct of prison officials and medical personal [sic]" denied him access to medical

6

care. On March 16, 2000, Artuz denied the grievance, reasoning that medical personnel had seen Espinal 31 times since October 1999, and granted the grievance to the extent that Espinal would continue to receive treatment as prescribed. On April 4, 2000, Espinal appealed, and on April 26, 2000, his appeal was denied.

In October 2004, the defendants moved for summary judgment, arguing that (1) all of Espinal's claims, except the excessive force and retaliation claims against Surber and Frasher, should be dismissed for failure to exhaust administrative remedies under the Prison Litigation Reform Act; and (2) the excessive force and retaliation claims against Surber and Frasher should be dismissed because Espinal raised no triable issues of material fact. The district court found that Espinal failed to exhaust his administrative remedies as to all defendants except Surber and Frasher because he never specifically named those defendants in his grievances. The district court noted that Espinal's grievances referred to the "countless security officers" involved in the December 17, 1999 incident, and to deliberate indifference by "Green Haven's Medical Dept.," "prison officials," and "medical personal [sic]" in connection with the alleged denial of medical appointments. But the district court considered these references insufficient to exhaust claims against unnamed defendants, "particularly given the fact that . . . [Espinal was] able to remember the names of the officers he claim[ed] to have taken part in the incidents" when he drafted his complaint in this lawsuit. The district court also dismissed the conspiracy claims against Surber and Frasher because, inter alia, Espinal never asserted the existence of a conspiracy to assault him or deny him medical care in either of his grievances.

The district court then turned to the remaining claims against Surber and Frasher. Espinal alleged that the beating by the officers was perpetrated in retaliation for a previous lawsuit

7

against several DOCS defendants, including Surber, that was filed in June 1998 and was dismissed on June 14, 1999. The district court found that Espinal's retaliation claims did not raise any triable issues of material fact. The district court considered the outcome of the grievance hearing on the December 17, 1999 incident, Espinal's history of misbehavior, and the length of time between the filing of the lawsuit and the incident (a year and a half after filing the lawsuit and six months after dismissal). The district court determined, however, that Espinal raised triable issues of material fact on the excessive force claims against Surber and Frasher.

The excessive force claims were tried before a jury on October 30, 31, and November 1, 2006. Espinal was represented by counsel at trial. The jury returned a verdict in favor of the defendants. Espinal's counsel moved for a new trial pursuant to Federal Rule of Civil Procedure 59(a). The district court denied the motion for a new trial in an oral decision.

Espinal filed a timely appeal of the September 1, 2005 order granting summary judgment in part and the January 11, 2007 order denying the motion for a new trial.

## DISCUSSION

### I.    Exhaustion of Administrative Remedies

#### A.    The Scope of the PLRA Exhaustion Requirement

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other

8

wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures. Booth v. Churner, 532 U.S. 731, 741 (2001).

In Woodford v. Ngo, the Supreme Court held that "the PLRA exhaustion requirement requires proper exhaustion." 548 U.S. 81, 93 (2006). The prisoner in Woodford argued that administrative remedies were unavailable once the prison rejected his grievance as untimely. Id. at 87. The Supreme Court rejected this argument. The Court held that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules" as a precondition to filing a federal lawsuit. Id. at 90. Woodford explained that compliance with state procedural rules is necessary to achieve "[t]he benefits of exhaustion [that] can be realized only if the prison grievance system is given a fair opportunity to consider the grievance." Id. at 95.

In Jones v. Bock, 549 U.S. 199 (2007), the Supreme Court was again confronted with several questions regarding the scope of the PLRA exhaustion requirement. One of those questions was whether a prisoner fails to exhaust a claim against a particular defendant by failing to name that defendant in the internal prison grievance. Id. at 205, 217. The Supreme Court explained that Woodford "held that to properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules' – rules that are defined not by the PLRA, but by the prison grievance process itself." Id. at 218 (quoting Woodford, 548 U.S. at 88) (citation omitted). It follows, as recognized by the Court, that "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim," because "it is the prison's requirements, and not

9

the PLRA, that define the boundaries of proper exhaustion." Id.

The exhaustion inquiry thus requires that we look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures. See Jones, 549 U.S. at 218; Woodford, 548 U.S. at 88-90. In Jones, a unanimous Supreme Court, employing this approach, found that Michigan's grievance procedures did not require the prisoner to specifically identify in his grievance those officials responsible for alleged misconduct, and only offered the general guidance that prisoners should "be as specific as possible" and "[b]e brief and concise" in framing their grievances. Id. at 218 (quotation marks omitted). The Court also noted that the inmate grievance forms did not prompt prisoners to name the responsible parties. Id. Because PLRA exhaustion only mandates compliance with the state's procedural rules and Michigan's procedures "ma[de] no mention of naming particular officials," there was no authority for a court to impose such a requirement. Id. The Court explained that the rationale for an identification requirement – notice to a particular official who may later be sued – was not one of the primary "benefits of exhaustion," which seeks to promote the ability of the prison system to respond to complaints, to reduce litigation, and to improve the record when litigation nonetheless commences in the courts. Id. at 219. The Court concluded that "exhaustion is not per se inadequate simply because an individual later sued was not named in the grievances." Id.

**B.     New York DOCS' Inmate Grievance Program**

The Second Circuit has yet to address the question presented in Jones as applied to New York DOCS' Inmate Grievance Program; that is, whether New York DOCS' Inmate Grievance Program regulations require a prisoner, in a grievance, to name particular officials who are

10

allegedly responsible for misconduct, in order to later bring suit against those officials in federal court. The question is presented here because the district court found non-exhaustion as to twelve of the fourteen defendants based exclusively on Espinal's failure to specifically name those defendants in either of his grievances.

We look first to the New York DOCS' Inmate Grievance Program ("IGP") procedures. The relevant regulations in this case are those that were in place during 1999 and 2000 when Espinal filed the grievances at issue. Those IGP regulations were repealed and new regulations were adopted in 2006. See N.Y. Comp. Codes R. & Regs., tit. 7, § 701.1 et seq. However, as noted by the State in its brief, there are only "minor differences" between the former and the current regulations. Hence, although we consider the regulations in place during 1999 and 2000 when Espinal filed his grievances, we note that our analysis is equally applicable to the regulations in place today.

The IGP has a regular three-tiered process for adjudicating inmate complaints: (1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ("IGRC"), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the Central Officer Review Committee ("CORC"). N.Y. Comp. Codes R. & Regs., tit. 7, § 701.7 (1999).[3] The IGP also has an "expedited" process for harassment grievances, id. § 701.11 (1999),[4] which pertains to "[e]mployee conduct meant to annoy, intimidate, or harm an inmate," id. § 701.11(a). See

_____

[3] This section of the IGP regulations on the regular grievance procedure is now codified at N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5 (2008).

[4] This section of the IGP regulations on harassment grievances is now codified at N.Y. Comp. Codes R. & Regs., tit. 7, § 701.8 (2008).

also <u>Hemphill v. New York</u>, 380 F.3d 680, 682-83 (2d Cir. 2004). A harassment grievance is sent directly to the superintendent. <u>Id.</u> § 701.11(b)(2). If the grievance is a bona fide harassment issue, the superintendent must initiate or request an investigation, <u>id.</u> § 701.11(b)(3-4), and render a decision, <u>id.</u> § 701.11(b)(5), after which the prisoner could then appeal to the CORC, <u>id.</u> § 701.11(b)(7). Espinal's grievance with respect to the December 17, 1999 incident was handled through the expedited procedure for harassment grievances, whereas the grievance charging that Espinal was not allowed to attend scheduled medical appointments was addressed through the regular three-tiered procedure.

The IGP regulations provide that an inmate must submit a complaint on an Inmate Grievance Complaint Form, or on plain paper if the form is not readily available. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.7(a). The regulations state that the "[c]ontent" of the grievance should include the inmate's name, department identification number, housing unit, and program assignment, <u>id.</u> § 701.7(a)(1)(i), and spaces for this information are included on the complaint form. This provision further states that "the grievance must contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint." <u>Id.</u> The complaint form also provides spaces for the inmate to include a "[d]escription of [p]roblem," which is to be "as brief as possible," and the "[a]ction requested."

The New York IGP regulations do not state that a prisoner's grievance must name the responsible party. Like the policy in <u>Jones</u>, 549 U.S. at 218, the IGP regulations offer the general guidance that a grievance should "contain a concise, specific description of the problem," N.Y. Comp. Codes R. & Regs., tit. 7, § 701.7(a)(1)(i), and the complaint form does not instruct the

12

inmate to name the officials allegedly responsible for misconduct. The Supreme Court in Jones held that similarly broad regulatory language in Michigan's grievance procedures was insufficient to convey an identification requirement. 549 U.S. at 218. We find that New York's IGP also does not contain an express identification requirement. The scope of proper exhaustion under the PLRA is determined by reference to the state grievance system's procedural rules. Jones, 549 U.S. at 218; Woodford, 548 U.S. at 88-90. Because New York's IGP does not articulate an identification requirement, it is plain that a New York state prisoner is not required to name responsible parties in a grievance in order to exhaust administrative remedies.

The State acknowledges the Jones decision but does not meaningfully address it. The State also has not pointed to any provision of the IGP regulations that constitutes an identification requirement. It might have pointed us to the section of the New York IGP regulations on harassment grievances which states that "[t]he employee who allegedly committed the misconduct shall be a direct party to [the] grievance." N.Y. Comp. Codes R. & Regs., tit. 7, § 701.11.[5] A "direct party" is defined as "[a]n individual so uniquely affected by the grievance that fair play dictates that he/she should be afforded the opportunity to provide input prior to any decision and also to appeal any disposition rendered." Id. § 701.2(h). A direct party, under the IGP regulations, is entitled to appear at hearings, to present information at hearings, to receive notice of hearing decisions, and to appeal adverse decisions. Id. §§ 701.7(a)(4)(i, iv, v), § 701.7(b), § 701.7(c), 701.11(b)(5).

The "direct party" provision, however, cannot be construed as an identification

---

[5] In the current regulations, substantially similar language is included in the definition of a "direct party." N.Y. Comp. Codes R. & Regs., tit. 7, § 701.2(i) (2008).

requirement. Nowhere in the regulations does it say that the prisoner must name each direct party in their grievance. To be sure, the State must be aware of the identity of a direct party to inform the employee that a claim has been made, that the employee is entitled to present information at a hearing, and that the employee may appeal adverse decisions. But the regulations do not clearly indicate that the onus of identification lies with the prisoner making a grievance. It is plausible that an identification requirement is absent from the regulations because there are cases when an inmate is unable to name responsible parties. Moreover, as long as the prisoner provides enough information about the alleged misconduct, which is a requirement already included in the IGP regulations, id. § 701.7(a)(1)(i), the State will normally be able to identify any direct party to a grievance on its own through investigation.

The pro se prisoner cannot be expected to infer the existence of an identification requirement in the absence of a procedural rule stating that the grievance must include the names of the responsible parties. Where New York's grievance procedures do not require prisoners to identify the individuals responsible for alleged misconduct, neither does the PLRA for exhaustion purposes. See Jones, 549 U.S. at 218.[6]

C.      Espinal's Grievances

---

[6] Because we find that New York's grievance procedures do not contain an identification requirement, our holding essentially follows the Jones decision. We are not presented with the question whether a state's procedural rules could be so onerous or impractical as to render administrative remedies unavailable and PLRA exhaustion inapplicable. See 42 U.S.C. § 1997e(a) (an inmate is only required to exhaust "such administrative remedies as are available"); cf. Hemphill, 380 F.3d at 686 (recognizing that "the behavior of the defendants may render administrative remedies unavailable," and "the PLRA's exhaustion requirement is inapplicable" under those circumstances). We note that this question would arise if the State were to adopt an identification requirement without making some allowance for non-compliance in circumstances when the inmate is unable to identify the responsible parties.

Given the foregoing analysis of New York's grievance procedures, Espinal was not required to specifically identify the responsible parties in his grievance in order to later name them as defendants in this lawsuit. Espinal only had to provide a specific description of the problem. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.7(a)(1)(i). We find that Espinal has complied with this requirement and exhausted his claims against the defendants.

Espinal's first grievance, in addition to alleging the involvement of Surber, Frasher, and "countless other security officers" in the beating, included the specific date, time, and location of the incident about which he complained, and that he was beaten for retaliatory reasons. These allegations provided enough information to "'alert the prison to the nature of the wrong for which redress [was] sought,'" Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004) (quoting Strong v. David, 297 F.3d 646, 650 (7th Cir. 2002)) (alteration omitted), and to "afford[] . . . time and opportunity [for the State] to address [the] complaint[] internally," id. (quoting Porter, 534 U.S. at 524-25). This is apparent from the prison officials' initiation of an investigation of Espinal's complaint. The investigator claims to have conducted interviews with "all officers involved," but does not specify the names of officers other than Surber and Frasher. Whether this means that no other officers were involved or that the investigator omitted other officers from the report is unknown. The point is that prison officials had the necessary information to investigate the complaints and the opportunity to learn which officers were involved in the alleged incident. Espinal's grievance was sufficient to advance the "benefits of exhaustion." Jones, 549 U.S. at 219.

We find that Espinal exhausted his excessive force and retaliation claims as to all defendants allegedly involved in the December 17, 1999 incident. The district court separately

15

found that Espinal failed to exhaust administrative remedies as to his conspiracy claims because he never asserted in his grievance the existence of a conspiracy to assault him. We do not read the requirement in the IGP that the grievance describe the problem to imply that the prisoner must "articulate legal theories." See Johnson, 380 F.3d at 697 (quoting Strong, 297 F.3d at 650). Espinal did not have to assert the existence of a conspiracy to exhaust his conspiracy claim; it is sufficient that his grievance adequately described the alleged misconduct.

The State argues that Espinal did not exhaust his claims against the defendants who allegedly denied medical care on December 17, 1999. While Espinal's grievance with respect to the December 17, 1999 incident does not explicitly discuss the misconduct by medical personnel which is alleged in the complaint, it is clear that the State considered these allegations when reviewing Espinal's grievance. Superintendent Artuz denied the grievance, in part, because Espinal "was not refused medical attention, [but] rather [himself], . . . refused medical assistance." Espinal thus exhausted his claims with respect to the alleged denial of medical treatment on December 17, 1999.

Espinal's second grievance also exhausted his claims that he was denied medical care in violation of the Eighth Amendment's prohibition on cruel and unusual punishment. The grievance alleged that Green Haven's Medical Department, its medical personnel, and prison officials refused to allow Espinal to attend his scheduled medical appointments. This was a sufficient description of the alleged wrong. The State's assertion that the grievance "failed to provide prison officials with sufficient notice of wrongdoing to cause them to investigate any such claim" cannot be squared with the conclusion of the investigator's report. The investigator found that medical personnel had seen Espinal thirty-one times since October 1999 and the

superintendent denied the grievance based on this finding. This grievance enabled the State to investigate Espinal's claim that he was denied access to medical care. Espinal has thus exhausted his Eighth Amendment claims.

On remand, the district court should consider whether Espinal's claims against the defendants present triable issues of fact.

## II. Espinal's Retaliation Claims

To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (quoting Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001), overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002)).[7] There is no dispute that Espinal's earlier federal lawsuit, filed in June 1998 and dismissed in June 1999, was a protected activity. See Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (holding that prison officials are prohibited from retaliating against prisoners who exercise the right to petition for redress of grievances). While the district

---

[7] We have described the essential elements of a First Amendment retaliation claim differently depending on the factual context. Compare Gill, 389 F.3d at 381 (requiring, in the prison context, that the prisoner responded to retaliatory conduct by defendants "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights" (quotation marks omitted)) with Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001) (requiring that a private citizen, who alleged he was arrested by public officials in retaliation for his unsuccessful campaign to unseat the Village's mayor, show that he was "actually chilled" in exercising his rights (quotation marks omitted)). See also Williams v. Town of Greenburgh, 535 F.3d 71, 76 (2d Cir. 2008). Espinal alleges retaliation in the prison context. The district court, in its decision below, stated that "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." See Dawes, 239 F.3d at 493. We therefore find that the "ordinary firmness" requirement applies here.

court appears to have assumed that the alleged beating was an adverse action for purposes of analyzing the existence of a causal connection, we have no trouble finding on the record in this case that there is a triable issue of fact as to whether a severe beating by officers over the course of thirty minutes would deter a person of "ordinary firmness" from exercising his rights. See Gill, 389 F.3d at 384. The remaining question is whether the officers' action was causally related to Espinal's filing of the earlier lawsuit.[8]

A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001); accord Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001). The district court found that Espinal failed to show a causal connection between the protected activity of filing a lawsuit and any adverse action by the officers during the December 17, 1999 incident. The district court stressed the length of time between the filing of the lawsuit, the termination of the lawsuit, and the incident (a year and a half after filing the lawsuit and six months after dismissal). The district court concluded that the time period was "too lengthy and the temporal relationship too attenuated to establish a causal connection" between the officers' action and Espinal's protected activity, and that there was no evidence Frasher was even aware of Espinal's prior lawsuit.

We have "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal

---

[8] The State argues in its petition for rehearing that the jury verdict rejecting Espinal's excessive force claim forecloses a necessary element of his First Amendment retaliation claim. We take no position on this question, leaving it to the district court to decide in the first instance on remand.

constitutional right and an allegedly retaliatory action." Gorman-Bakos, 252 F.3d at 554. This has allowed our Court to exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases. Compare Hollander v. American Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (finding a lack of evidence that an adverse action, taken three months after the plaintiff's EEOC complaint, was in response to the plaintiff's protected activity) with Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980) (finding that the lapse of eight months between an EEOC complaint and retaliatory act indicated a causal connection).

Here, we find that the passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by officers, one of whom (Surber) was a defendant in the prior lawsuit, is sufficient to support an inference of a causal connection. See Gorman-Bakos, 252 F.3d at 555 (suggesting the lapse of five months between protected activity and retaliation may show a causal connection). It is plausible that the officers waited to exact their retaliation at an opportune time – as when Espinal was involved in a fight with another inmate – in order to have a ready explanation for any injuries suffered by Espinal. Moreover, we cannot conclude that there is no evidence that Frasher was aware of Espinal's prior lawsuit. Viewing the evidence in the light most favorable to Espinal, as we must, it is a legitimate inference that Frasher, as a member of Green Haven's emergency response team with Surber on December 17, 1999, learned of the prior lawsuit from Surber, who was a defendant in the earlier lawsuit, or from other officers aware of the lawsuit, and took action in response to Espinal's protected activity.

We reverse the district court's dismissal of Espinal's retaliation claims against Surber and

19

Frasher. The district court should consider on remand whether Espinal also raises triable issues of fact with respect to other officers, if any, that were involved in the December 17, 1999 incident. Espinal also alleged in his complaint that medical personnel refused him medical treatment on December 17, 1999 in retaliation for his previous lawsuit against Surber and other officers. The district court did not consider whether the evidence supported a claim that the actions of medical personnel were in retaliation for Espinal's filing of a lawsuit. We leave it to the district court to address this question in the first instance.

## C. Espinal's Motion for a New Trial

We review the denial of a motion for a new trial for abuse of discretion. Kosmynka v. Polaris Industries, Inc., 462 F.3d 74, 82 (2d Cir. 2006). Espinal raised the following arguments in support of his motion: (1) he was wearing prison attire at trial which caused him prejudice; (2) his request to have his sister testify as a rebuttal witness was improperly denied; (3) the district court should have given a curative instruction to the jury when defense counsel asked Espinal on cross-examination whether he had been convicted of murder and robbery; and (4) the jury verdict was against the weight of the evidence. The district court rejected those arguments. We find no error in the district court's denial of Espinal's motion.

The district court reasonably determined that Espinal's clothing did not cause him prejudice because he was wearing jeans and a sweatshirt which "looked like civilian clothing." It is highly unlikely that Espinal's clothing had an influence on the jury verdict. See Tesser v. Bd. of Educ. of City Sch. Dist. of City of New York, 370 F.3d 314, 319 (2d Cir. 2004) (stating that the grant of a new trial depends on "the likelihood that [an] error affected the outcome of the case" (quotation marks omitted)).

The district court acted within its discretion in precluding the rebuttal testimony of Espinal's sister. Espinal sought to introduce his sister's testimony to rebut defendants' testimony regarding the extent of Espinal's injuries. It was necessary, however, for Espinal to offer evidence of the extent of his injuries in his case in chief in order to show that he was subjected to a beating at the hands of the officers. Espinal did so by offering his medical records which were also read into evidence by defense witnesses. The district court reasonably found that evidence of Espinal's injuries was already placed before the jury and that the sister's testimony lacked impeachment value. Cf. Pitasi v. Stratton Corp., 968 F.2d 1558, 1561-62 (2d Cir. 1992) (finding exclusion of testimony erroneous when it was unnecessary during the plaintiff's case in chief but material to the impeachment of defense witnesses).

The district court also acted within his discretion in determining that defense counsel's question to Espinal during cross-examination, asking whether he was convicted of murder and robbery, did not warrant a curative instruction or a new trial. Espinal's counsel asked prospective jurors during voir dire about their thoughts regarding Espinal's murder conviction, and identified Espinal's murder conviction in his opening statement to the jury. Defense counsel was also permitted to explore Espinal's murder conviction on cross-examination. The district court accurately characterized the reference to a robbery conviction as comparably "minor." Also, the jury was instructed that questions are not evidence and Espinal never answered the question. The reference to the robbery did not create "undue prejudice or passion" as to warrant a new trial. Matthews v. CTI Container Transp. Int'l, Inc., 871 F.2d 270, 278 (2d Cir. 1989).

Espinal's claim that the jury verdict was against the weight of the evidence is not reviewable on appeal. Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp., 73 F.3d 1178, 1199

21

(2d Cir. 1995), <u>modified on other grounds</u>, 85 F.3d 49 (2d Cir. 1996).

**IV.      Espinal's Request for a Temporary Restraining Order**

Espinal requests a temporary restraining order and a transfer of custody for the first time on this appeal.  We generally will not consider arguments raised for the first time on appeal. <u>Universal Church v. Geltzer</u>, 463 F.3d 218, 228 (2d Cir. 2006).  Espinal may renew this request on remand.

**CONCLUSION**

For the foregoing reasons, we REVERSE the district court's dismissal of Espinal's 42 U.S.C. § 1983 claims on the basis of failure to exhaust administrative remedies; we REVERSE the district court's dismissal of the retaliation claims against Surber and Frasher; we AFFIRM the district court's denial of the motion for a new trial on the excessive force claims against Surber and Frasher; we DENY Espinal's request for a temporary restraining order; and we REMAND for proceedings consistent with this opinion.